## MINCO, INC.

v.

## COMBUSTION ENGINEERING, INC.

### No. 2:89–CV–113.

United States District Court,
E.D. Tennessee,
at Greeneville.

June 22, 1995.

Order Amending Judgment
Sept. 18, 1995.

Charles R. Terry, Terry, Terry and Stapleton, Morristown, TN, Robert E. Pitts, R. Bradford Brittian, Pitts and Brittian, Knoxville, TN, James R. Higgins, Jr., Middleton & Reutlinger, Louisville, KY, for Minco, Inc.

George W. Morton, Jr., Morton & Morton, Knoxville, TN, Robert L. Harmon, Gary M. Ropski, John J. Pavlak, Willian Brinks Hofer Gilson & Lione, Chicago, IL, for Combustion Engineering, Inc.

### ORDER

HULL, District Judge.

This patent infringement matter is before the Court for findings of fact and conclusions of law following the trial of this cause. The Court first notes that prior to trial, the parties, plaintiff Minco, Inc. ("Minco") and defendant Combustion Engineering, Inc. ("Combustion"), by counsel, agreed to the following "framework" of facts for the purposes of trial:

1. In or about 1960, William T. Rawles formed Tennessee Electro Minerals, Inc. ("TEM") with manufacturing facilities in Greeneville, Greene County, Tennessee.

2. TEM's products included fused silica ($SiO_2$) and fused Magnesia ($MgO$).

3. From its formation, Rawles was president of TEM.

4. In or about 1960, Rawles hired Verneil Richards as a secretary and bookkeeping employee. In the early to mid 1960s, Rawles hired Kenneth Jenkins (Richards' brother) as a maintenance employee. Rawles also hired Ivan Potter (Jenkins' son-in-law) as a production supervisor.

5. In 1970, Combustion acquired TEM; Rawles was retained as general manager of TEM, under an employment contract.

6. Rawles' employment contract precluded him from competing with Combustion/TEM in the fused $SiO_2$ business for three years after his employment with Combustion/TEM was terminated.

7. Rawles' employment contract also contained provisions regarding inventions which Combustion contends assigned Rawles' interest in the patent-in-suit to Combustion.

8. By 1976–77 Combustion/TEM was using a rotary "jumbo kiln" to manufacture fused $SiO_2$. The jumbo kiln was a flat-ended cylinder that was suspended between stands and rotated via babbitt bearings and journal bearings affixed to the stands.

9. In or about the spring of 1977, Combustion hired Robert Ross to manage the TEM fused $SiO_2$ and fused $MgO$ facilities in Greeneville.

10. On May 13, 1977, Rawles resigned from Combustion.

11. On July 29, 1977, Combustion fired Jenkins, Richards and Potter.

12. Minco is a Tennessee corporation with its principal place of business in Midway, Greene County, Tennessee.

13. Minco was formed on September 23, 1977, by Jenkins and Richards, and another; Ivan Potter became a Minco employee.

14. Rawles was not an owner or employee of Minco.

15. Minco built a new factory in Midway for the production of fused $SiO_2$, incorporating an externally driven rotary furnace with conical ends, one of which was removable to provide for selective access to and removal of a fused mass of silica.

16. On May 9, 1978, Jenkins and Rawles filed a patent application, entitled "Rotary Furnace for Fusion of Mineral Bearing Substances, Apparatus and Method", Serial No. 904,441, in the United States Patent & Trademark office ("PTO") through patent attorney J. Gibson Semmes.

17. During August–September, 1978, three Combustion employees (Manis, Norton and Sutphin) quit Combustion, worked at Minco, then were re-hired by Combustion.

18. On April 4, 1979, Jenkins and Rawles filed a continuation in part application in the PTO, Serial No. 27,155, through attorney Semmes.

19. On August 12, 1980, the PTO issued United States Patent No. 4,217,462 ('462 Patent) entitled "Rotary Furnace for Fusion of Mineral Bearing Substances, Apparatus and Method" to Rawles and Jenkins. The '462 Patent issued with Claims 1—5.

20. From the time Minco began production (July, 1978) to July 31, 1990, Minco manufactured and sold fused silica ($SiO_2$) in direct competition with Combustion, produced at Minco's plant in Midway in fusion furnaces which Minco contends are made according to the '462 Patent.

21. At the time of 1977 to around 1989, other USA producers of fused $SiO_2$ included Harbison–Walker and LECO Corporation.

22. From before October 1977 to November of 1987, Combustion manufactured fused $SiO_2$ in its jumbo kilns.

23. From before October 1977 to December 19, 1986, Combustion manufactured fused MgO at a plant in Greeneville, TN.

24. On December 19, 1986, Combustion sold its fused MgO business, including the fused MgO production facility in Greeneville, to Tateho America, Inc.

25. From early 1981 to December 1986, the Operations Manager of Combustion's facilities in Greeneville was Abdul Labi.

26. From December, 1986 to July 31, 1990, the Operations Manager of Combustion's Greeneville facilities was Ken Jones.

27. Beginning in February 1986, Combustion began fusing $SiO_2$ in its "R.T. Kiln," a rotary furnace which Minco contends infringes the '462 Patent.

28. Combustion acquired its R.T. Kilns by way of five separate Appropriation Requests.

29. By November, 1987, Combustion had fully converted its $SiO_2$ fusion furnaces to the R.T. Kiln.

30. Beginning in about April 1988, Combustion's fused $SiO_2$ sold in the marketplace was fused solely in the R.T. Kiln.

31. On February 23, 1988, Richards purchased Rawles' ownership interest in the '462 Patent, so far as it related to the fusion of $SiO_2$ for $250,000.

32. On October 31, 1988, an investment group, headed by John Carberry, purchased the assets of Minco for $11.4 Million, including $5 Million allocated to purchase the '462 Patent from Jenkins and Richards. Carberry became Minco's president.

33. On November 3, 1988 Minco sent Combustion a letter charging that Combustion's R.T. Kiln infringed the '462 Patent.

34. On December 10, 1988, Combustion through in-house patent attorney William Habelt denied infringement and contended that Combustion had an ownership interest in the '462 Patent.

35. On March 30, 1989, Minco filed suit against Combustion for infringement of the '462 Patent. Minco alleges that Combustion is liable for direct infringement up to July 31, 1990, and for actively inducing infringement after July 31, 1990.

36. Combustion denies that it infringed the '462 Patent, or has actively induced infringement. In addition, Combustion has filed a counterclaim contending that the '462 patent is invalid and/or unenforceable; Combustion further contends it has an ownership

interest in the '462 Patent under its employment contract with Rawles.

37. In Spring 1989, Minco added four fusion furnaces.

38. On October 12, 1989, Ransom & Randolph, Minco's largest customer, signed a distribution agreement with Combustion and thereafter purchased fused $SiO_2$ predominately from Combustion.

39. On February 7, 1990, Combustion filed a Request for Reexamination of the '462 Patent, No. 90/001,934.

40. On May 14, 1990, PEMCO, Inc. (a new fused $SiO_2$ company formed by Abdul Labi who had left Combustion) filed a Request for Reexamination of the '462 Patent, No. 90/002,024.

41. On May 23, 1991, Combustion filed a second Request for Reexamination of the '462 Patent, No. 90/002,353.

42. All three Requests for Reexamination were consolidated by the PTO.

43. On July 31, 1990, Combustion sold its minerals businesses to IMETAL, a French corporation. The transaction included the sale of Combustion's fused $SiO_2$ business, including the Greeneville facility containing the R.T. Kilns. That sale ended Combustion's involvement in the fused $SiO_2$ business.

44. From August 1, 1990 to and including the present day, the Greeneville fused $SiO_2$ facility has been owned and operated by a Tennessee corporation, Tennessee Electro Minerals, Inc. ("TECO"). TECO is a subsidiary of C–E Minerals, Inc., which is based in King of Prussia, Pennsylvania. C–E Minerals is a USA subsidiary of IMETAL.

45. Combustion does not own or control TECO or C–E Minerals, Inc.

46. From August 1, 1990 to and including the present day, TECO has made and sold fused $SiO_2$ in its Greeneville facility, in direct competition with Minco.

47. TECO is not a party to this case.

48. John Carberry ceased being Minco's president in January, 1993.

49. Thomas A. Cole became Minco's president on July 1, 1993, and presently occupies that position.

50. On October 12, 1993, the PTO issued Reexamination Certificate B1 4,217,462 to Minco.

51. As a result of the Reexamination proceedings, claims 1, 2 and 5 of the '462 Patent were cancelled as unpatentable over the prior art; claims 3 and 4 of the '462 Patent were determined to be patentable over the prior art as amended (with the word "housing" substituted for "furnace"); and new claims 6–22 were added and determined to be patentable over the prior art.

52. All of the reexamined claims are directed to a furnace apparatus; none claim a process or method.

53. In or about December, 1991, TECO changed the design of the ends of its R.T. Kilns, to a "stepped end" design; TECO applied for and was issued U.S. Patent 5,235,611 on its new design.

54. The parties intend to file an Agreed Schedule showing the respective sales of fused $SiO_2$ by Minco, Combustion and TECO.

55. Claims 3, 4 and 14 are the only claims alleged to be infringed.

In addition, the Court adopts that following findings of fact submitted by the plaintiff:

### REGARDING THE BEST MODE DEFENSE:

56. Combustion contends that Jenkins and Rawles, the inventors of the '462 Patent, concealed the best mode for practicing their invention, in violation of the Best Mode requirement of 35 U.S.C. § 112 in two ways, [1] with respect to certain details of the drive system of Minco's production furnace, namely, the use of rubber tires, the use of six drive wheels and the use of a guide plate, and [2] regarding details of the crane supports.

57. The drive system was disclosed in the patent application [PTX 564], and no new matter concerning the drive system was included in the CIP [PTX 542]. Therefore, the date for evaluating the disclosure of the '462 Patent with respect to the drive system is May 9, 1978 when the patent application was filed, prior to when commercial activities commenced at Minco.

58. The proof established that Jenkins began fusing silica at Minco utilizing the invention of the '462 Patent some time in July of 1978, and that the number and type of drive wheels needed will vary depending upon the use to which the furnace is put; *e.g.*, the load in the furnace, the expected temperature of the shell and the speed at which the furnace is rotated.

59. With respect to the number of drive wheels, Jenkins initially planned to use three drive wheels, as disclosed in the parent application [Tr. I, 166], but he decided to use four wheels "a month or two" before he started fusing silica at Minco in July of 1978 [Tr. I, 165–66]. After fusing his first ingot in July of 1978, Jenkins decided to change from a four to a six wheel drive system [Tr. I, 171–72].

60. Plaintiff's expert Dr. Corbett testified that one skilled in the art would know that the number of wheels required can and will vary depending upon the weight of the material being heated or fused, the weight of the load introduced into the furnace housing, the size and the load bearing capabilities of the wheels [Tr. I (Jenkins), 173; Tr. II(2) (Corbett), 60–61].

61. On Minco's production furnace a guide plate is utilized to interact with the thrust flanges on each end of the furnace to keep the furnace from migrating along the drive stand. Jenkins testified that a guide plate is not needed when the furnace is driven by steel wheels, which is the type of wheel utilized by Mr. Jenkins when he first operated Minco's furnace. As set forth above, the proof established that steel wheels or some other type wheels would be needed for a calcining operation because the slow speed would "burn the tires off" [Tr. II(1) (Jenkins), 14–15].

62. Combustion further contends that Jenkins and Rawles concealed the best mode for practicing their invention with respect to the number and location of the crane supports on the cylindrical section of the housing of the '462 Patent.

63. The '462 Patent specification does not specify a required number, or location, of crane supports on the cylinder. Figure 2 of the '462 Patent depicts one slightly off-center crane support on the cylinder. This is the location that Combustion used for a crane support on its RT Kiln [Tr. IV (Jones), 16; DTX 438–A].

64. On the Minco production furnace, Jenkins utilized two crane supports on the cylindrical section of the housing (the "cylinder"), with one being located on each end of the cylinder near the openings. Jenkins testified that he utilized the two crane supports located on the ends of the cylinder to maintain the furnace in a level position, for safety purposes, while it was being transported. Jenkins testified that the specific number and location of crane supports on the cylindrical housing was not what he contemplated the invention to be [Tr. II(1) (Jenkins), 13–15]. Instead, he contemplated that the invention was,

> an entirely new concept for a furnace. It was a furnace I could rotate with outside means. It was a furnace that I could take the conical cone off and remove the ingot out of the furnace. It was also a furnace that had conical ends that would get away from a support on the ends of the furnace, such as I was accustomed to.

Tr. II(1), 13–14. Jenkins also testified that once an engineer knew this concept, "I'm sure he would" know what kind of wheels to use, or the number of wheels or crane hooks or thrust guide to use [*Id.*].

### REGARDING INEQUITABLE CONDUCT:

65. At the outset, the Court notes that Combustion stipulated that it was not contending that the '462 patent was invalid under 35 U.S.C. §§ 102(b) [Tr. V, 114–15]. Rather, Combustion asserts that certain alleged prior art, which it is not asserting under Section 102(b), should have been disclosed to the PTO by Minco during the reexamination proceedings, and the failure to do so is inequitable conduct rendering the '462 Patent unenforceable.

66. Combustion contends that certain alleged commercial activity by Mr. Rawles, in connection with a so-called "torpedo" furnace and/or a furnace at Graphite Sales, should have been disclosed to the patent office examiner during the reexamination. Combus-

tion's patent expert testified that in his opinion, Minco and its attorneys failed to meet the duty of disclosure owed to the Patent Office. However, it is clear from his testimony that his opinion was based on the *general* definition of materiality set forth in Rule § 1.56, not the *specific* Rule 1.555 for reexaminations.

67. Combustion admitted that the Graphite Sales torpedo furnace did not have crane supports. Combustion Post–Trial Brief, p. 34. Also, as Rawles testified, the furnace he used for Graphite Sales could not be lifted from the drive mechanism [Tr. V, 64]. The plaintiff contends that the "torpedo furnace" did not address the problem solved by the invention claimed in Claims 3 and 4, namely lifting the kiln away from the drive mechanism so that the kiln could be lifted and tilted to remove the contents (such as a fused ingot) therefrom. Combustion nevertheless contends that the alleged torpedo furnace was material because it included all of the features of original claim 1 of the '462 patent, and would have rendered that claim unpatentable. Further, Minco's patent expert testified that even if it was assumed that there was a public use as contended by Combustion, the subject matter at issue would not be any closer prior art than the *Sunnen* and *Cousteix* patents that the examiner already had in front of him. Consequently, even if the "torpedo" furnace were a patent or printed publication (which it is not) that furnace would be cumulative and therefore not material under prior art. [Tr. VI (Witherspoon), 171–72].

68. The proof also shows that Rawles' activity was a "feasibility study" [Tr. V, 62–63; DTX 123]. Thus there is evidence that Rawles' efforts, whether regarding the "torpedo" furnace or the furnace tested by Graphite Sales, were experimental, not commercial. The experimental nature was confirmed by Graphite Sales' Mr. Elkins who testified, "there was some kind of secrecy." [PTX 629A (Elkins), 13].

69. Minco's reexamination attorneys did not disclose the "torpedo" or "Graphite Sales" furnace during reexamination proceedings because William West, Minco's reexamination counsel, determined there were "very substantial matters in controversy" concerning the structure of same, and therefore the Patent Office would not consider them material because "the patent examiner is not a fact finder" [PTX 629B (West), 41–42]. West, however, at the request of Combustion did submit the information about Graphite Sales as identified in Combustion's § 282 notice to the PTO reexamination examiner. West invited Combustion to suggest other documents to submit to the PTO [PTX 584, p. 3], but Combustion never did. The PTO *returned* those documents submitted at Combustion's request, because "the paper filed on March 29, 1990, goes beyond a mere citation of patents and printed publications" [PTX 580]. The proof also shows that, by mistake, the PTO returned this document to *Combustion's* counsel.

## INFRINGEMENT:

70. Minco asserts that Combustion's RT Kiln infringes Claims 3 and 4 of the '462 Patent Reexamination Certificate literally or, alternatively, under the doctrine of equivalents. Claims 3 and 4 read as follows:

3. Rotary furnace for the continuous electric heating and/or fusion of mineral bearing substances comprising:

(A) a cylindrical housing, said housing having a first conical extension fixed to one end thereof and a second removable conical extension detachably secured to an opposite end thereof, both said extensions having outer openings which are coaxially aligned with the housing;

(B) opposed electrodes having a source of power, said electrodes being set in coaxial relation to the housing and being removably sustained, in spaced relation to each other and to the outer openings of the conical extensions;

(C) means engageable with the exterior of the housing to rotate the housing; and

(D) a crane support mounted upon each said housing and removable conical extension for lifting and tilting the [furnace] *housing* to remove the contents thereof.

4. Rotary furnace for the continuous electric heating and/or fusion of mineral bearing substances comprising:

(A) a cylindrical housing, said housing having a first conical extension fixed to one end thereof and a second removable conical extension detachably secured to an opposite end thereof, both said extensions having outer openings which are coaxially aligned with the housing, the removable conical extension being secured to the housing by means of opposed claim elements, said claim elements having removable locking means engaging the said clamp elements;

(B) opposed electrodes having a source of power, said electrodes being set in coaxial relation to the housing and being removably sustained, in spaced relation to each other and to the outer openings of the conical extensions;

(C) means engageable with the exterior of the housing to rotate the housing; and

(D) a crane support mounted upon each said housing and removable conical extension for lifting and tilting the [furnace] *housing* to remove the contents thereof.

71. The dispute is over the following limitations with the terms at issue being underlined: (1) "for the *continuous* electric heating and/or fusion ..."; (2) "a ... *conical* extension *fixed* to one end thereof"; and (3) "a crane support mounted upon each said housing and removable conical extension *for lifting and tilting the housing* to remove the contents thereof." [PTX 533 and 534].

72. The RT Kiln is loaded with sand and rotated while heat is continuously applied to the furnace charge. The heat is generated by an arc drawn between opposed electrodes introduced through each end of the kiln. When a fused ingot has been formed the electrodes are withdrawn, and the ingot is allowed to cool while the RT Kiln continues to rotate. After a sufficient cooling period, one end of the RT Kiln housing is removed and the rest of the housing is lifted and tilted to discharge the ingot from the furnace. Thereafter, the operation begins anew with the introduction of a new load of sand into the RT Kiln [Tr. II(2) (Corbett), 21–43; PTX 539A].

73. The specification of the '462 Patent discloses, and Claims 3 and 4 claim, a furnace which has a detachably secured end that is removed so that the furnace housing can be lifted and tilted to dump the fused ingot.

74. The specification located in Co14 lines 53–56 states:

Whereas, the device has been described principally with respect to high speed, fusion activity, if lined with a refractory, it may be *continuously* fed and discharged while slow rotation is undertaken, as in roasting.

PTX 1, Col. 4 lines 53–56.

75. The patented furnace produces an ingot of fused silica that could not be discharged through the openings in the conical extensions of the furnace housing, which is the manner in which removal would have to be effected in a continuous feeding and discharging operation. Rather, with the patented furnace, one of the extensions must be removed in order to dump the contents of the furnace [Tr. V (Rawles), 49].

76. The phrase "top hat" first appeared in Combustion's in-house patent attorney Habelt's response [PTX 216] to Minco. Habelt described the "top hat" section as "a centrally axially extending recess having a taper of about 13→," which appears to describe a cone. As to the proof at trial, both the patented furnace and the RT Kiln include a housing, which consists of a center cylindrical section and an extension on each end that has an opening to allow for the insertion of opposed electrodes to accomplish the continuous electric heating and fusion of silica sand PTX 1; 464, 525–531, 539A].

77. Combustion denies these extensions were "conical" extensions. However, Combustion's appropriation requests seeking funds to build the RT Kilns did refer to the RT Kiln housing as having "conical ends" [*See, e.g.,* PTX 137, Bates No. 06281]. Further, Combustion's nonlitigation drawings also refer to the ends of the housing as cones [PTX 183 and PTX 184], and Combustion's witness Ken Jones twice referred to the ends of the RT Kiln as "cones" [Tr. IV, p. 31, lines 3–7 and p. 32, lines 1–2].

78. Combustion's witnesses assert that the RT Kiln does not have conical extensions as called for by Claims 3 and 4 because the

RT Kiln has an annular flange on each end of the cylinder to which the conical "top hat" sections are attached, of the conical extensions of the RT Kiln the proof established that the extensions of the RT Kiln perform substantially the same function in substantially the same way to achieve substantially the same result as the conical extensions of the patented furnace. Specifically, Dr. Corbett testified that, like the conical extensions of Claims 3 and 4, the extensions of the accused device provide for a layer of unfused material which is centrifugally maintained against the walls of the extensions to insulate the ends of the furnace from the heat of the arc [Tr. VI (Corbett), 139–140]. Further, Dr. Corbett testified that, like the conical extensions of Claims 3 and 4, the RT Kiln extensions allow a longer arc to be drawn and more material to be produced than that which could be produced in an equivalent time period in prior art furnaces (e.g., the jumbo kiln) [Id.]. Dr. Corbett also testified that, as compared to the prior art, the RT Kiln extensions, like the extensions of Claims 3 and 4, reduce the amount of recycled material that results from the operation of the furnace [Id.].

79. There is a dispute with respect to this limitation revolves around the meaning of the word "fixed" in Claims 3 and 4. Dr. Corbett testified that "fastened" is a synonym for "fixed", and that "fixed" means "securely fastened" such that, when the main portion of the housing is lifted, the end follows [Tr. II(2), 40–41].

80. In examining the RT Kiln, one of its conical extensions is removed to dump the ingot. This removable extension is attached to the cylindrical section of the housing with four quick-disconnect turnbuckles that clamp or hook the removable end to the cylinder, as called for by both claims 3 and, particularly, 4. The other end, which remains stationary throughout the entire process of producing a fused silica ingot, is attached to the cylinder with ten nuts and bolts [Tr. IV (Jones), 33–35; PTX 526, 527]. During trial, Combustion referred to the RT Kiln extensions as the "dumping end" and "non-dumping" end, respectively, prior to this litigation, Combustion's non-litigation drawings referred to the

"non-dumping" extension of its RT Kiln as the "stationary end" [Tr. V. (Jones), 95–97; PTX 183, 184, 582].

81. The equivalency of the non-dumping, bolted extension on the RT Kiln (PTX 527) can be seen in the photographs depicting the operation of the RT Kiln and the RT Kiln videotape [PTX 525–31, 539A]. Specifically, the non-dumping extension serves as one of the ends of the RT Kiln housing, as does the fixed extension of the patented furnace. The non-dumping extension of the RT Kiln also remains attached to the cylindrical portion of the housing throughout the entire fusion operation, as does the fixed extension of the patented furnace. Further, the non-dumping extension serves to allow insertion of one of the two electrodes necessary to fuse an ingot, as does the fixed extension of the patented furnace.

82. Minco's patent expert Mr. Witherspoon testified that the prosecution history of the reexamination proceedings [PTX 460] and the specification of the '462 Patent [PTX 1, Col. 3, lines 57–60] indicate that the fixed conical extension of the patented furnace encompasses a removable conical extension that is "securely fastened" to the cylindrical section of the furnace housing [Tr. VI (Witherspoon), 163–164]. During reexamination the Examiner stated as follows with respect to the meaning of "fixed":

[T]he patent owner's assertion that the term "fixed" is broad enough to encompass both the meanings of *securely fastened* and non-removable is *accepted.* DTX 180, PTX 460, p. 277.

83. The final limitation at issue is in subparagraph D of Claims 3 and 4 as follows:

*(D)* a crane support mounted upon each said housing and removable conical extension for lifting and tilting the housing to remove the contents thereof.

84. As to the crane supports, the Examiner stated as follows during reexamination:

There is no prior art furnace which teaches the use of a crane support on the cylindrical housing and a crane support on the removable conical end which is attached to the cylindrical housing *so that* the whole furnace housing can be lifted and trans-

ported to dump the finished product through the removable end.

PTX 460.

85. Regarding crane supports, the specification reads:

> Upon completion of the fusion process, the entire kiln is crane lifted from the driving cradle support 156 and the cone 120' is removed, whereupon the kiln is tilted and the formed ingot dumped....

> In fusion practice, the removal of one end cone permits tilting the furnace to dump the ingot, a practice which is virtually impossible through the use of prior art devices.

PTX 1, Col. 3, lines 39–42; Col. 4, lines 40–43.

### LACHES:

86. Combustion alleges that Minco is barred by laches from any recovery for infringement occurring prior to the commencement of this litigation on March 30, 1989. Mr. Rawles and Mr. Jenkins became aware in 1979 or 1980 that Combustion had unsuccessfully attempted to replicate Minco's patent furnace (i.e., Combustion's "prototype" kiln). However, the "prototype" kiln failed and was never put into production and was *abandoned* by Combustion to the scrap pile in 1980. All other possible delay times are less than six (6) years. Rawles became aware of Combustion's RT Kiln in 1985–1986, and charged to Labi that the furnace being developed was an infringement of the '462 Patent; measured from that time the delay until filing suit was at most four years. However, commercial production using the RT Kiln did not commence until February of 1986 [ASF 27]; measured from that time, the delay until filing suit was three years. Rawles also told Ken Jones in January 1987 that Combustion's RT Kiln infringed the '462 Patent; measured from that time, the delay until filing suit was two years. However, during 1986–87, Combustion blended its "RT silica" with its other silica [Tr. IV (Jones), 110–112; PTX 570, Bates 06830],

### ADDITIONAL FINDINGS OF FACT BY THE COURT:

1. It was impossible for Rawles, or Minco or anyone, to verify the actual extent of Combustion's infringing activities, because Combustion operated both kinds of kilns temporarily. Rawles testified that:

> I was instructed by my attorney that you don't have a case, you don't start a fight in court unless you can prove that they produced and sold using that specific kiln, and until that time, shut up.

[Tr. V (Rawles, 47].

2. Correspondence dated December 19, 1983, from Richard H. Berneike of Combustion Engineering to Hoet Fitzsimmons of Tennessee Electro Minerals indicates as follows:

> Re: *Rawles' Patent 4,217,462*

> I did a computer search and found the attached patent which would appear to be the one you requested. We are not able to get the patent drawings from the computer but I have ordered a copy of the full patent and will send it to you as soon as it is received.

[PTX 50].

3. Although Combustion hired engineer Nick Valk to help design the RT Kiln, Combustion never showed Valk the '462 Patent. Valk testified at his deposition on August 11, 1994 as follows:

> Q. Had you ever had any experience with fused silica kilns prior to your work with CE?

> A. No, definitely not. Not silica kilns, no.

> Q. Mr. Valk, do you recall being asked the question when you first saw the patent in suit, the Minco patent?

> A. Oh yeah, certainly.

> Q. Do you recall us laying that patent down on the table in front of you?

> A. You showed me a picture that was in the patent. I've never seen the patent per se; never read the patent; never had a hold of one, but you did show me a picture that looked similar to what we laid out, yes.

Q. Showed you a picture that looked similar to the conception drawings that you did?

A. Yeah.

Q. And that was in the patent; is that correct?

A. That was the patent that you showed me, yes.

Q. Do you recall the first three words that you said when I showed you that patent?

A. Oh yeah.

Q. What did you say?

A. I'll be damned. Didn't I? Because I was highly surprised to see that because I didn't—I was not under the understanding or the knowledge that there was a patent available.

Q. And did you know whether Mr. Fitzsimmons had knowledge of that patent?

A. If he did he never mentioned it to me. I swear that to the day—today as today. No. Nobody ever talked about a patent until you showed me that patent. That was the very first time.

Q. Did you know that Mr. Fitzsimmons had a copy of that patent prior to your meeting with him?

A. I learned that since then, yes, indeed.

Q. And I believe you said that you would be surprised if that was the case?

A. Yes.

Q. And why would you be surprised?

A. Because I would have felt used.

Q. You would have felt what?

A. Used.

Q. Do you feel used now? I want an honest answer.

A. If that's the case, yes.

Q. Mr. Valk, let me hand you a document that has been marked Plaintiff's Deposition Exhibit 48, Trial Exhibit 51, and this is a document forwarded by Mr. Berneike, B–E–R–N–E–I–K–E, with Combustion Engineering Corporate Patent Department to Hoyt Fitzsimmons.

A. I've seen it.

Q. What do you think about that?

A. Well, what kind of an answer are you looking for, Bob?

Q. Well, are you surprised that Fitzsimmons had the Minco patent prior to his first meeting with you?

A. Yeah.

Q. Do you feel like you've been used as a scapegoat?

A. To some extent, yes.

PTX 624, 69–73.

## CONCLUSIONS OF LAW:

### BEST MODE DEFENSE

■ In regard to the defendant's best mode defense, the Federal Circuit in *Transco Products Inc. v. Performance Contracting, Inc.*, 38 F.3d 551, 559–560 (Fed.Cir.1994) has summarized:

The determination as to whether the best mode requirement has been satisfied is a question of fact. *Spectra–Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1535–36, 3 USPQ2d 1737, 1745 (Fed.Cir.). *cert. denied*, 484 U.S. 954, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987); *McGill Inc. v. John Zink Co.*, 736 F.2d 666, 676, 221 USPQ 944, 951 (Fed.Cir.), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984). The purpose of the best mode requirement is to "restrain inventors from applying for patents while at the same time concealing from the public preferred embodiments of their invention which they have in fact conceived." *In re Gay*, 309 F.2d 769, 772, 135 USPQ 311, 315 (CCPA 1962). A holding of invalidity for failure to disclose the best mode requires clear and convincing evidence that the inventor both knew of and concealed a better mode of carrying out the claimed invention than was set forth in the specification. *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1578, 18 USPQ2d 1001, 1012 (Fed.Cir.1991). The burden of establishing invalidity by this standard lies with the party seeking such a holding.

The Court in *Transco, supra,* at 557–558, also notes:

It has been held that the appropriate date for determining compliance with the best

mode requirement for a reissue application is the filing date of the original application and not that of the reissue application. *Dow Chemical Co. v. American Cyanamid Co.,* 615 F.Supp. 471, 482, 229 USPQ 171, 179 (E.D.La.1985), *aff'd,* 816 F.2d 617, 2 USPQ2d 1350 (Fed.Cir.1987), *cert. denied,* 484 U.S. 849, 108 S.Ct. 149, 98 L.Ed.2d 105 (1987).

The Court goes on to explain:

Contrary to Transco's assertions, public policy does not demand that the public receive a new best mode disclosure in all continuing applications. Such a rule would subvert the patent system's goal of promoting the useful arts through encouraging early disclosure. An inventor's motivation to file early and then continue to test and improve upon his invention would be stifled by the knowledge that any progress that he made could preclude him from enjoying the procedural benefits available through continuing application practice. If he later developed better modes for practicing an invention adequately disclosed in an earlier filed application, he would nonetheless have to redraft his disclosure to add these later-developments upon filing a continuing application.

*Transco, supra,* at 558.

In addition, the Court states:

Moreover, imagine the practical implications if an applicant were forced to update the best mode disclosure upon each filing of a continuing application. Under current practice, the filing of many, if not most, continuing applications is merely a matter of form not requiring any input from the inventor. The best mode requirement, however, focuses on what the inventor knows. Thus, under the district court's holding, an attorney would necessarily be forced to discuss with an inventor any progress that has been made regarding the invention each time that a continuing application is filed, even when it is being filed merely for administrative convenience. This result would be completely contrary to current continuing application practice.

*Transco, supra,* at 558.

Based on the foregoing review of the record, the Court finds that Combustion failed

to prove by clear and convincing evidence that the inventors both knew of and concealed the use of four or six drive wheels or rubber tires prior to the critical date of the filing date of the parent application on May 9, 1978. The proof established that the number and type of drive wheels and the thrust system needed, can and will vary, depending upon the use of the furnace, and that one skilled in the art would know the number and type of wheels and type of thrust system needed for a particular application. Accordingly, the Court finds that Combustion failed to prove by clear and convincing evidence that the inventors concealed the best mode for practicing their invention with respect to the drive system.

■ Based on the evidence introduced at trial, the Court finds that Combustion failed to prove by clear and convincing evidence that the inventors both knew of and concealed that a specific number of crane supports must be used on the center cylindrical section, or that the furnace housing must be maintained in a particular (*e.g.,* level) position to successfully practice the concept that Jenkins considered the invention. Jenkins testified that the use of two crane supports on the cylinder, like the number and location of driving wheels or the type of driving wheels, is a production detail, not an aspect of the invention, required to successfully carry out the invention [Tr. II(1) (Jenkins), 15]. Combustion presented no testimony from one skilled in the art to rebut this proof, or that the disclosure of the crane supports was inadequate to successfully practice the invention of the '462 Patent. Further, the Court finds it revealing that Combustion's RT Kiln used a single crane support on the center housing as disclosed in the '462 Patent.

Accordingly, the Court finds that Combustion failed to prove by clear and convincing evidence that the inventors of the '462 Patent violated the best mode requirements of 35 U.S.C. § 112 with respect to the crane supports of the patented furnace.

### INEQUITABLE CONDUCT DEFENSE

■ The Court finds it is undisputed that Minco did in fact submit the information about the Graphite Sales furnace to the PTO,

however, these documents were returned by the PTO, because they went beyond a mere citation of patents and printed publications. Accordingly, the Court finds that neither the "torpedo" furnace nor Mr. Rawles' alleged commercial activity regarding Graphite Sales are "a patent or printed publication" which would classify the reference as "material" under Patent Office Rule 1.555 in a reexamination, and that there was no inequitable conduct on the part of Minco for failure to disclose this alleged "prior art," because it was in fact submitted to the PTO but returned.

### LITERAL INFRINGEMENT

The procedure to follow in determining literal infringement is summarized in *Lantech, Inc. v. Keip Mach. Co.*, 32 F.3d 542, 546 (Fed.Cir.1994) as follows:

> Determining whether the claims of a patent have been literally infringed is a two-step process: first, the claims must be interpreted to determine their proper scope; thereafter, the claims as thus interpreted are applied to the accused device. *Palumbo v. Don–Joy Co.*, 762 F.2d 969, 974–75, 226 USPQ 5, 7 (Fed.Cir.1985).

Regarding claim interpretation, the court states:

> To determine the intended meaning of a claim, we look to the claim language in context of the specification and the prosecution history. *C.R. Bard [v. Advanced Cardiovascular Systems, Inc.]*, 911 F.2d [670] at 673, 15 USPQ2d [1540] at 1543.

*Lantech, supra,* at 546.

After determining the intended meaning of a claim, the court in *Lantech, supra,* at 547, goes on to explain:

> Literal infringement is found where the accused device falls within the scope of the asserted claims as properly interpreted. *Palumbo,* 762 F.2d at 974, 226 USPQ at 7. For literal infringement, each limitation of the claim must be met by the accused device exactly, any deviation from the claim precluding a finding of infringement. *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1577, 12 USPQ2d 1382, 1384 (Fed.Cir. 1989).

### A. CLAIM CONSTRUCTION

The Court finds the testimony of Dr. Corbett and Mr. Witherspoon to be persuasive on the issue of claim construction. The dispute is over the following limitations which Combustion contends are not present in its RT Kiln, the terms at issue being underlined: (1) "for the *continuous* electric heating and/or fusion ...")"; (2) "a ... *conical* extension *fixed* to one end thereof"; and (3) "a crane support mounted upon each said housing and removable conical extension *for lifting and tilting the housing* to remove the contents thereof." [PTX 533 and 534].

### CONTINUOUS

■ Dr. Corbett testified that the term "continuous" modifies "heating", not "fusion" such that electric heating without interruption, as well as fusion, takes place in the patented furnace [Tr. II(2) (Corbett), 30–31, 33–34 and 38–40]. Based upon this testimony, the court finds that term "continuous" modifies "heating and not "fusion" for purposes of claim construction in regard to this limitation.

### CONICAL EXTENSION FIXED TO ONE END THEREOF

■ The dispute with respect to this limitation revolves around the meaning of the word "fixed" in Claims 3 and 4. Dr. Corbett testified that "fastened" is a synonym for "fixed", and that "fixed" means "securely fastened" such that, when the main portion of the housing is lifted, the end follows [Tr. II(2), 40–41]. The court finds that terms "fixed", "fastened", and "securely fastened" are synonyms for purposes of claim construction in regard to this limitation. This interpretation is supported by the reading of the claim, the testimony of witnesses, as well as the prosecution history. DTX 180, PTX 460, p. 277.

### CRANE SUPPORT FOR LIFTING AND TILTING THE HOUSING

■ The language of subparagraph D, properly interpreted, simply requires that there be a crane support mounted on the

removable, detachably secured, conical extension ("dumping" end) and a crane support mounted on the remainder of the housing, with both such crane supports being involved in facilitating the lifting and tilting of the housing "so that" the contents of the furnace (*e.g.*, a fused silica ingot) can be removed out the detachably secured end. In this regard, the reading of the claim language supports this interpretation [PTX 2, Col. 1, lines 40–43, 63–66], as does the prosecution history.

## B. INFRINGEMENT
### CONTINUOUS

■ With respect to the preamble, "for the continuous electric heating and/or fusion," Combustion contends this is inapplicable, because the RT Kiln accomplishes fusion of silica in a batch operation [Tr. IV (Jones), 62]. The RT Kiln is loaded with sand and rotated while heat is continuously applied to the furnace charge. The heat is generated by an arc drawn between opposed electrodes introduced through each end of the kiln. When a fused ingot has been formed the electrodes are withdrawn, and the ingot is allowed to cool while the RT Kiln continues to rotate. After a sufficient cooling period, one end of the RT Kiln housing is removed and the rest of the housing is lifted and tilted to discharge the ingot from the furnace. Thereafter, the operation begins anew with the introduction of a new load of sand into the RT Kiln [Tr. II(2) (Corbett), 21–43; PTX 539A].

Mr. Bell testified that the fusion which takes place in the RT Kiln is a batch operation [Tr. V, 155]. Although Mr. Witherspoon testified that once the heating begins, there is continuous heating and fusion until the ingot has been formed [Tr. VI (Witherspoon), p. 165], Minco's experts, Dr. Corbett and Mr. Witherspoon, also testified that Claims 3 and 4 claim a furnace that is directed to a batch operation with respect to fusion activities.

The specification of the '462 Patent discloses, and Claims 3 and 4 claim, a furnace which has a detachably secured end that is removed so that the furnace housing can be lifted and tilted to dump the fused ingot. This is clearly a periodic feature of a batch operation that precludes the continuous feeding and withdrawing called for in a continuous fusion operation, as Dr. Corbett testified [Tr. VI (Corbett), 138–139]. The proof established that fusion is performed in the patented furnace in a batch operation, not a continuous fusion operation.

The specification located in Col4 lines 53–56 states:

Whereas, the device has been described principally with respect to high speed, fusion activity, if lined with a refractory, it may be *continuously* fed and discharged while slow rotation is undertaken, as in roasting.

PTX 1, Col. 4 lines 53–56. The specification thus plainly distinguishes between high speed fusion activity and "continuous" feeding and discharging during slow rotation. Further, on cross-examination, Mr. Bell admitted that the patented furnace could be used for a batch operation [Tr V, 195].

The proof also shows that the patented furnace produces an ingot of fused silica that could not be discharged through the openings in the conical extensions of the furnace housing, which is the manner in which removal would have to be effected in a continuous feeding and discharging operation. Rather, with the patented furnace, one of the extensions must be removed in order to dump the contents of the furnace [Tr. V (Rawles), 49]. A claim must be read in the light of common sense to accomplish the objectives of the invention. If "continuous" meant what Combustion claims, a key objective of the patent (Col 1, lines 11–17) could not be achieved.

Therefore, the Court finds that both the patented furnace and the RT Kiln utilize a batch operation. The Court finds that Combustion's asserted position that the patented furnace calls for a continuous feeding and discharging operation is contrary to the proper claim construction and the proof in this cause, that accordingly, this distinction asserted by Combustion does not prevent the accused device from infringing the patent. To the contrary, the Court finds that the limitation of "continuous" heating is present in the RT Kiln.

### CONICAL EXTENSION FIXED TO ONE END THEREOF

■ Dr. Corbett and Mr. Witherspoon testified that the conical extensions of Claims 3 and 4 are literally present in the RT Kiln [Tr II(2) (Corbett), 30–31, 33–34; Tr. III (Witherspoon), 33–35]. Claims 3 and 4 do not require or claim a conical extension of any particular angle.

Combustion contends that the accused RT Kiln does not have conical extensions as called for by Claims 3 and 4, but rather has "top hat" extensions. The phrase "top hat" first appeared in Combustion's in-house patent attorney Habelt's response [PTX 216] to Minco. Habelt described the "top hat" section as "a centrally axially extending recess having a taper of about 13→," which appears to describe a cone.

As to the proof at trial, both the patented furnace and the RT Kiln include a housing, which consists of a center cylindrical section and an extension on each end that has an opening to allow for the insertion of opposed electrodes to accomplish the continuous electric heating and fusion of silica sand PTX 1; 464, 525–531, 539A].

Combustion at trial refused to admit these extensions were "conical" extensions. However, Combustion's appropriation requests seeking funds to build the RT Kilns did refer to the RT Kiln housing as having "conical ends" [See, e.g., PTX 137, Bates No. 06281]. Further, Combustion's nonlitigation drawings also refer to the ends of the housing as cones [PTX 183 and PTX 184], and Combustion's witness Ken Jones twice referred to the ends of the RT Kiln as "cones" [Tr. IV, p. 31, lines 3–7 and p. 32, lines 1–2].

Moreover, the presence of an additional structural element does not take the conical extensions of the RT Kiln outside the literal coverage of Claims 3 and 4. The Court observed that the "top hat" extensions of the RT Kiln are attached to the center cylindrical section, albeit via the annular flange. Thus, the cylindrical section "ha[s] a first conical extension ... and a second conical extension detachably secured to the opposite end thereof," as called for by Claims 3 and 4. The presence of the annular flange is an additional structural element of no conse-

quence in proper claim interpretation. In this regard, the only purpose which the flange might serve is to reduce the angle. Accordingly, the Court finds the literal presence of "conical" extensions in the RT Kiln.

■ Combustion contends that the RT Kiln does not have a "fixed" conical extension because both of the conical extensions on the RT Kiln are removable. In this regard, Mr. Jones and Mr. Bell claimed that "fixed" means that one conical extension of the '462 Patent is welded to, or integral with, the housing [Tr. IV (Jones), 69; V (Bell), 136–137].

In examining the RT Kiln, one of its conical extensions is removed to dump the ingot. This removable extension is attached to the cylindrical section of the housing with four quick-disconnect turnbuckles that clamp or hook the removable end to the cylinder, as called for by both claims 3 and, particularly, 4. The other end, which remains stationary throughout the entire process of producing a fused silica ingot, is attached to the cylinder with ten nuts and bolts [Tr. IV (Jones), 33–35; PTX 526, 527]. During trial, Combustion referred to the RT Kiln extensions as the "dumping end" and "non-dumping" end, respectively. It is noted by the Court, however, that prior to this litigation, Combustion's non-litigation drawings referred to the "non-dumping" extension of its RT Kiln as the "stationary end" [Tr. V. (Jones), 95–97; PTX 183, 184, 582].

The existence of a non-dumping, bolted extension on the RT Kiln (PTX 527) can be seen in the photographs depicting the operation of the RT Kiln and the RT Kiln videotape [PTX 525–31, 539A]. Specifically, the non-dumping extension serves as one of the ends of the RT Kiln housing, as does the fixed extension of the patented furnace. The non-dumping extension of the RT Kiln also remains attached to the cylindrical portion of the housing throughout the entire fusion operation, as does the fixed extension of the patented furnace. Further, the non-dumping extension serves to allow insertion of one of the two electrodes necessary to fuse an ingot, as does the fixed extension of the patented furnace. Combustion does not cite to any

difference between the way the non-dumping end of the RT Kiln and the fixed end of the patented furnace function during the fusion process. Combustion introduced no prior art which would be ensnared by an interpretation of "conical extensions" which covers the extensions of the accused device.

Combustion's patent expert Mr. Bell contended that the prosecution history of the '462 Patent prohibits the plaintiff from asserting an interpretation of "fixed" which includes "removable" [Tr. V, 137–144]. However, Minco's patent expert Mr. Witherspoon pointed out that the prosecution history of the reexamination proceedings [PTX 460] and the specification of the '462 Patent [PTX 1, Col. 3, lines 57–60] indicate that the fixed conical extension of the patented furnace encompasses a removable conical extension that is "securely fastened" to the cylindrical section of the furnace housing [Tr. VI (Witherspoon), 163–164].

Based upon the proper claim interpretation, the Court finds the literal presence of a fixed conical extension as called for by Claims 3 and 4. Moreover, even if it were determined that there is a difference in the meanings of the terms "securely fastened" and "detachably secured" in the '462 Patent, such that the detachably secured ("dumping") extension is more readily removable, the "fixed" limitation is literally present in the accused device [Tr. IV (Jones), 22, 34]. In this regard, the bolted-on, non-dumping extension is both removable and securely fastened such that it remains stationary relative to the rest of the housing during the operation of the RT Kiln [PTX 539A].

### CRANE SUPPORT FOR LIFTING AND TILTING THE HOUSING

The final limitation at issue is in subparagraph D of Claims 3 and 4 as follows:

(D) a crane support mounted upon each said housing and removable conical extension for lifting and tilting the housing to remove the contents thereof.

The crane supports of the accused device perform the function of lifting and tilting the RT Kiln housing so that "the contents thereof" may be removed. [Tr. II(2) (Corbett), 33, 36, 21–43; PTX 539A; Tr. III (Witherspoon), 34; PTX 464, 503, 531]. In this regard, the crane support on the detachably secured conical extension of the RT Kiln performs the function of removing or lifting away the extension so that the remainder of the housing can be lifted and tilted via the crane support mounted on the cylindrical section of the housing. The crane support on the removable conical extension clearly participates in the lifting and tilting operation because without the lifting away of the detachable extension, the ingot could not be dumped when the remainder of the housing is tilted.

Therefore, regardless of whether the detachable extension is viewed as being part of the housing, the crane support on the removable conical extension is involved in the process whereby the housing is lifted and tilted "to remove the contents thereof."

The Court finds that the limitations of subparagraph D are literally present in the accused device. The structure is admitted to be present [Tr. V (Jones), 97; V (Bell), 208]. Further, as will be noted, the specification states that the housing is crane lifted, but there is no requirement, either in the specification or the claims, that the crane support on the removable end participate in that particular function. It could be lifted solely by the crane support on the remainder of the housing. Thereafter, as the above-referenced language indicates, the removable conical extension is removed so that the remainder of the housing may be tilted "to remove the contents thereof." Therefore, as to the tilting, the remainder of the housing is tilted via its crane support after the detachably secured end has been removed via its crane support.

Accordingly, literal presence of all limitations of subparagraph D and infringement has been established.

### LACHES

Where the defense of laches is established, the patentee's claim for damages prior to suit may be barred. A presumption of laches arises where a patentee delays bringing suit for more than 6 years, after the date the patentee *knew or should have known* of the alleged infringement. This presumption has the effect of shifting the

burden of going forward with evidence, but not the burden of persuasion. The elements of laches are as follows:

 (a) patentee's delay in bringing suit was unreasonable and inexcusable.

 (b) the alleged infringer suffered material prejudice *attributable to the delay.*

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.,* 960 F.2d 1020, 1028 (Fed.Cir.1992).

■■■ Based upon the limited knowledge that Rawles had of Combustion's kilns, the manner in which Combustion operated both types of kilns, as well as Combustion's practice in regard blending its RT silica with other silica, the Court finds that the defendant Combustion has failed to show by clear and convincing evidence that the Rawles knew or should have known that Combustion was infringing this patent in 1979 or 1980. Therefore the presumption of laches does not arise. Based upon this lack of knowledge on the part of Rawles or Jenkins, the Court also finds that Combustion has failed to show that the delay in instituting this lawsuit was unreasonable or inexcusable.

In addition, Combustion has failed to show that any expenditures that it made were attributable to the delay, as opposed to attributable to routine business expansion or renovation. Therefore, the defense of laches is not available to Combustion.

### WILLFULNESS AND ENHANCED DAMAGES

A summary of the authority for increased damages is set out in *BIC Leisure Products v. Windsurfing Intern.,* 1 F.3d 1214, 1222–1223 (Fed.Cir.1993), as follows:

The patent statute authorizes courts to award increased damages. 35 U.S.C. § 284 (1988). A court may award enhanced damages under this section upon a finding of willful infringement. *Avia Group Int'l Inc. v. L.A. Gear California, Inc.,* 853 F.2d 1557, 1566, 7 USPQ2d 1548 (Fed.Cir.1988). In "exceptional cases" the district court may award attorney fees to the prevailing party. 35 U.S.C. § 285 (1988). Both willfulness and exceptionality are questions of fact that this court reviews under the clearly erroneous standard. *See State Indus. [v. Mor–Flo In-*

*dus., Inc.],* 883 F.2d [1573] at 1581; *Fromson v. Western Litho Plate & Supply Co.,* 853 F.2d 1568, 1573, 7 USPQ2d 1606, 1611 (Fed.Cir.1988). Windsurfing had the burden of proving by clear and convincing evidence that BIC's infringement was willful and that the case was exceptional. *State Indus.,* 883 F.2d at 1581; *Badalamenti v. Dunham's, Inc.,* 896 F.2d 1359, 1364, 13 USPQ2d 1967, 1972 (Fed.Cir.) *cert. denied sub. nom., Hyde Athletic Indus. Inc. v. Badalamenti,* 498 U.S. 851, 111 S.Ct. 142, 112 L.Ed.2d 109 (1990).

In *State Industries, supra,* at 1581, the Court further explains:

To establish willful infringement, a plaintiff must prove by clear and convincing evidence that the defendant acted with no reasonable basis for believing it had the right to do so. *E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, 1440, 7 USPQ2d 1129, 1137 (Fed.Cir. 1988). There are no "hard and fast *per se* rules," and the finding is based on the totality of the circumstances. *Rolls–Royce Ltd. v. GTE Valeron Corp.,* 800 F.2d 1101, 1110, 231 USPQ 185, 191 (Fed.Cir.1986).

Addressing the applicable standard for proving willfulness, the Court states:

The standard for proving willfulness, however, is "whether, under all the circumstances, a reasonable person would prudently conduct himself with any confidence that a court might hold the patent invalid or not infringed." *Ryco [v. Ag–Bag Corp.],* 857 F.2d [1418] at 1428, 8 USPQ2d [1323] at 1331. Actual knowledge is not required.

*State Industries,* supra at 1581.

■■■ It is well-settled that copying is evidence of willful infringement. *State Industries, supra,* at 1582; *Kaufman Co. v. Lantech, Inc.,* 807 F.2d 970, 978, 1 USPQ2d 1202, 1208 (Fed.Cir.1986). The Court finds by clear and convincing evidence that Combustion obtained a copy of the '462 patent on or about December of 1983 for the purpose of copying that patent. The Court finds that the testimony of engineer Nick Valk is also clear and convincing that although Combustion hired Mr. Valk to purposely pattern the

RT Kiln after the patent, Combustion did not show Mr. Valk the copy of the patent even though it was in Combustion's possession at that time. Therefore, the Court finds that under all the circumstances of this case, Combustion's infringement of the '462 patent was willful, and that the defendant had no reasonable basis to believe that a court might hold the patent not infringed.

The Court in *Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 29 U.S.P.Q. 1507, 1516 (7th Cir.1994), notes that "exceptional cases" have been interpreted to mean cases where the acts of infringement can be characterized as malicious, fraudulent, deliberate, or willful. The Court **FINDS** in this case the defendants' acts of infringement were deliberate and willful, and accordingly, that this is an "exceptional case."

### FINDINGS OF FACT AND CONCLUSIONS OF LAW IN REGARD TO DAMAGES:

### IN GENERAL

The Federal Circuit has explained an award of damages for infringement of a patent as follows:

The measure of damages is an amount which will compensate the patent owner for the pecuniary loss sustained because of the infringement. 35 U.S.C. § 284 (1982); *see also General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 654–55, 103 S.Ct. 2058, 2061–62, 76 L.Ed.2d 211, 217 USPQ 1185, 1188 (1983); *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1326, 5 USPQ2d 1255, 1260 (Fed.Cir.1987). But the floor for a damage award is no less than a reasonable royalty, *Seattle Box Co. v. Industrial Crating & Packing Inc.*, 756 F.2d 1574, 1581, 225 USPQ 357, 363 (Fed. Cir.1985), and the award may be split between lost profits as actual damages to the extent they are proven and a reasonable royalty for the remainder. *See TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 898, 229 USPQ 525, 526 (Fed.Cir.1986).

*State Industries, supra,* at 1577.

The parties have stipulated that damages are limited to the time frame of May 1, 1988 to July 31, 1990. Minco does not claim lost profits for 1986 or 1987, because during that time Combustion was selling "blended" silica and did not have full "RT silica" in the market.

### LOST PROFITS

■ Based on the evidence presented at trial, the Court concludes that Minco has met its burden to show it is entitled to recover its lost profits on Combustion's sales within Minco's capacity. There is evidence of demand for the patented furnace, and of the absence of acceptable non-infringing substitutes, both shown by strong market preference for the fused silica produced by the patented furnace and by the actions of Harbison–Walker and LECO in ceasing fusion of fused silica in deference to the '462 Patented furnace; Combustion's sales reports [PTX 570], Appropriation Requests [PTX 132–137] and the McCarthy memo [PTX 46] are further evidence of the absence of acceptable non-infringing substitutes. The Court further concludes that Minco had capacity to meet at least a larger percentage of the demand, as shown by Minco' actual performance in 1990 after it lost the R & R account. The Court concludes that Minco is entitled to recover its lost profits at the rate of 53% of sales, which was the figure established by plaintiff's expert, Stanley Roy, who testified that he calculated Minco's earnings before interest and taxes or "EBIT" to be 53%.

The Court adopts the following calculations as set out in plaintiff's trial exhibits 603 and 604:

| YEAR | COMBUSTION POUNDS SOLD | MINCO POUNDS SOLD | 95% CAPACITY | LOST SALES IN POUNDS |
|---|---|---|---|---|
| 1986 | 9,378,000 | 19,161,740 | 28,500,000 | N/A |
| 1987 | 26,080,000 | 18,495,840 | 28,500,000 | N/A |
| 1/1–4/30/88 | 9,803,084 | 7,843,146 | 9,500,000 | N/A |
| 5/1–12/31/88 | 27,719,733 | 15,686,292 | 19,000,000 | 3,313,708 |

| YEAR | COMBUSTION POUNDS SOLD | MINCO POUNDS SOLD | 95% CAPACITY | LOST SALES IN POUNDS |
|---|---|---|---|---|
| 1989 | 45,404,300 | 25,721,464 | 42,750,000 | 17,028,536 |
| 1990 (to 7/31) | 30,146,350 | 19,077,788 | 24,937,500 | 5,859,712 |
| SUBTOTAL | 148,531,467 | 105,986,270 | 153,187,500 | 26,201,956 |

| YEAR | LOST SALES IN POUNDS | ASP | SALES LOST | AVERAGE EBIT% | LOST PROFITS |
|---|---|---|---|---|---|
| 5/1 to 12/31/88 | 3,313,708 | $0.268 | $ 888,074 | 53% | 470,679 |
| 1989 | 17,028,536 | 0.255 | 4,342,277 | 53% | 2,301,407 |
| 1990 (to 7/31) | 5,859,712 | 0.220 | 1,289,137 | 53% | 683,243 |
| SUBTOTAL | | | | | $3,455,329 |

Based on the foregoing, and the evidence presented at trial, the Court concludes that Minco is entitled to recover lost profits in the amount of $3,455,329.00 in regard to Combustion's sales of fused silica for those sales within Minco's post-infringement capacity of 45 million pounds per year. *Mor–Flo, supra.*

### PRICE EROSION

The Court finds that the evidence regarding an award of price erosion lost profits is too speculative, and accordingly, the plaintiff has failed to prove that it could have sold its silica at higher prices "but for" Combustion's infringement. *BIC Leisure Products v. Windsurfing Intern.*, 1 F.3d 1214, 1220 (Fed. Cir.1993).

### REASONABLE ROYALTY:

#### USE

 The Court concludes that, under the circumstances of this case, in addition to lost profits, Minco is entitled to recover damages computed as a reasonable royalty on Combustion's sales beyond Minco's capacity. *Mor–Flo, supra; Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y.1970), aff'd and modified, 446 F.2d 295 (2d Cir.1971). Regarding the "Georgia Pacific" factors during hypothetical negotiations occurring in 1985, the Court finds and concludes that the following facts tend to decrease the royalty in favor of Combustion: [1] if Minco licensed Combustion, it would not have to deal with the many and complex problems of manufacturing; [2] Combustion's large and established sales force would ensure a good income from the license; and [3] Minco would not have to worry about such a large competitor. The following facts tend to increase the royalty rate in favor of Minco: [1] Minco and Combustion are head-to-head competitors; [2] in 1985, Minco's fused silica from the patented furnace was preferred in the market, while Combustion considered itself as a "source of last resort;" [3] the value of the patented furnace is strongly evidenced in the marketplace and in Combustion's own documents; [4] Minco had a very high profitability rate (53% EBIT) established; [5] Minco had the capacity and unencumbered earnings to further exploit the advantages of the patented furnace; [6] Combustion had a strong need to gain the advantages of the patented furnace; [7] the opinion testimony of Dr. Corbett confirms that the value of the patented furnace was very high; [8] there was strong testimony that the patented furnace exhibited substantial advantages over the prior art; in fact, Combustion called it a "major breakthrough;" [9] reasonably prudent businessmen would realize that Combustion's desire to maintain its market share would compel Combustion to accept Minco's high royalty demands, because there was no acceptable non-infringing furnace that Combustion could use to produce acceptable fused silica to compete effectively with Minco; [10] the relatively high profit performance of the industry (Combustion had good EBIT performance [22.4%, PTX 591, Bates 09793] with use of its

jumbo kilns; and [11] reasonably prudent small businessmen would not want to license such a large and direct competitor at a modest or even a modestly high royalty rate. The Court also notes that Combustion's EBIT increased to 41.35% after Combustion had fully switched to the RT Kiln. [PTX 591].

In addition, regarding the number of pounds that this reasonable royalty would apply, the Court adopts the following calculations set out in plaintiff's trial exhibit 603 and 605.

| | COMBUSTION | MINCO | | | |
|---|---|---|---|---|---|
| YEAR | POUNDS SOLD | POUNDS SOLD | 95% CAPACITY | LOST SALES IN POUNDS | COMBUSTION POUNDS SOLD SUBJECT TO ROYALTY |
| 1986 | 9,378,000 | 19,161,740 | 28,500,000 | N/A | 9,378,000 |
| 1987 | 26,080,000 | 18,495,840 | 28,500,000 | N/A | 26,080,000 |
| 1/1–4/30/88 | 9,803,084 | 7,843,146 | 9,500,000 | N/A | 9,803,084 |
| 5/1–12/31/88 | 27,719,733 | 15,686,292 | 19,000,000 | 3,313,708 | 24,406,025 |
| 1989 | 45,404,300 | 25,721,464 | 42,750,000 | 17,028,536 | 28,375,764 |
| 1990 (to 7/31) | 30,146,350 | 19,077,788 | 24,937,500 | 5,859,712 | 24,286,638 |
| SUBTOTAL | 148,531,467 | 105,986,270 | 153,187,500 | 26,201,956 | 122,329,511 |

Based on the foregoing, and the evidence presented at trial, the Court concludes that Minco is entitled to recover reasonable royalty damages at a royalty rate of 20% of Combustion's sales of fused silica for those sales beyond Minco's post-infringement capacity of 45 million pounds per year. *Mor-Flo, supra. Bio–Rad Laboratories, Inc. v.* *Nicolet Instrument Corp.,* 739 F.2d 604 (Fed. Cir.1984) (mixed profits/royalty case; industry standard royalty rate was from 3% to 10%, but 33% royalty rate affirmed); *Radio Steel & Mfg. Co. v. MTD Prod., Inc.,* 788 F.2d 1554 (Fed.Cir.1986) (10% royalty rate exceeded the infringer's total profit (6%), affirmed).

| YEAR | COMBUSTION SALES FROM RT KILN–LBS | COMBUSTION SALES SUBJECT TO ROYALTY–LBS | SELLING PRICE ($/LB) | COMBUSTION SALES SUBJECT TO ROYALTY ($) | MINCO'S REASONABLE ROYALTY DAMAGES @ 20% |
|---|---|---|---|---|---|
| 1986 | 9,378,000 | 9,378,000 | $0.292 | $ 2,738,376 | $ 547,675.20 |
| 1987 | 26,080,000 | 26,080,000 | $0.300 | 7,824,000 | $1,564,800.00 |
| 1988 | 37,522,817 | 34,209,109 | $0.324 | 11,083,751 | $2,216,750.20 |
| 1989 | 45,404,300 | 28,375,764 | $0.320 | 9,080,244 | $1,816,048.80 |
| 1990 (7/31) | 30,146,350 | 24,286,638 | $0.260 | 6,314,526 | $1,262,905.20 |
| TOTAL | | | | | $7,408,179.40 |

Accordingly, the plaintiff is entitled to a reasonable royalty of $7,408,179.40 as a royalty on the fused silica sold beyond Minco's capacity.

*SALE:*

 Taking into consideration the fact that there was little or no proof about the manner in which TECO operated Combustion's RT Kilns after TECO purchased the kilns in August of 1990, and given the stipulated fact that by December of 1991, TECO was using its own "stepped end" design which was patented by TECO, the Court finds that the plaintiff has failed to carry its

burden of proof that the acquisition of these RT Kilns was a determinative factor in the sale of the plant to TECO, or that the acquisition of these RT Kilns was instrumental in generating a profit for Combustion as a result of this sale. Therefore, the Court finds that based upon the lack of evidence in this case to support this element of damages, the plaintiff is not entitled to recover a reasonable royalty on this sale.

### PREJUDGMENT INTEREST:

#### PLAINTIFF'S FINDINGS OF FACT ADOPTED BY THE COURT

 Minco's damages expert Stan Roy computed that Minco is entitled to recover prejudgment interest at "prime minus two" [PTX 494, 597, 599]. The Court finds that this interest rate is reasonable under the facts of this case. The Supreme Court has held that an award of damages under 35 U.S.C. § 284 requires an award of prejudgment interest from the time infringement began until judgment. *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983). Prejudgment interest can be computed at a variety of rates, from the Tennessee legal rate of ten percent (10.0%) per annum, or "prime" or any other reasonably applicable interest rate measure. *Studiengesellschaft Kohle v. Dart Indust., Inc.*, 862 F.2d 1564 (Fed.Cir.1988). Prejudgment interest does not apply to any enhanced or punitive portion of an award. *Lam, Inc. v. Johns–Manville Corp.*, 718 F.2d 1056, 1066 (Fed.Cir.1983); *Underwater Devices v. Morrison–Knudsen Co.*, 717 F.2d 1380, 1389 (Fed.Cir.1983). However, prejudgment interest does apply to recoveries for both lost profits and reasonable royalty. *Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 556 (Fed.Cir.1984).

Based on the evidence presented at trial, and the total record of this case, the Court concludes that Minco is entitled to prejudgment interest at the rate of *"prime minus two" percent*, compounded on both lost profits and reasonable royalty.

### INJUNCTIVE RELIEF:

Because the parties have stipulated that the sale to TECO on July 31, 1990 ended Combustion's involvement in the fused $SiO_2$ business, the Court finds that injunctive relief is not necessary at this time, because there is no apparent threat of injury, loss, or damage to the plaintiff should injunctive relief not be granted. Rule 65, Federal Rules of Civil Procedure.

### CONCLUSION:

For the reasons set out herein, the Court finds that because Combustion's RT Kiln literally infringes claims 3 and 4 of the '462 patent, Minco is entitled to recover lost profits in the amount of $3,455,329.00 as well as the sum of $7,408,179.40 as a reasonable royalty, plus prejudgment interest at the rate of "prime minus two" percent on a compounded basis. Because the Court finds that this infringement was willful and that this is an exceptional case, the total of loss profits plus the reasonable royalty, or the sum of $10,863,508.40, will be doubled for an award of $21,727,016.80 plus attorneys fees.

Accordingly, it is hereby **ORDERED** that judgment is entered for the plaintiff in the sum of $21,727,016.80 plus prejudgment interest on the sum of $10,863,508.40, plus attorneys' fees. The plaintiff will have fifteen days from the date hereof to submit its itemized petition for attorneys fees to the date of this Order, as well as its calculations on prejudgment interest at the rate of "prime minus two" percent, compounded on the sum of $10,863,508.40 accruing as set out in the schedules contained in this order.

### ORDER ON POST–TRIAL MOTIONS

This patent infringement matter is before the Court to consider three post-trial motions filed by the plaintiff. After careful consideration of the record as a whole, including all of the evidence at trial, the Court finds as follows:

### MOTION TO AMEND JUDGMENT

During the course of this matter, the defendant moved for summary judgment. As one of the defendant's theories, the defendant contended that the results of the reexamination of the patent dictated summary judgment. It is undisputed that claims 1, 2, and 5 did not survive re-examination, however the defendant also contended that claims 3

and 4 had substantive changes made during re-examination, and that therefore there can be no infringement, or in the alternative, even if there were no substantive changes, there was no infringement. Based upon the countervailing affidavit and exhibits filed by the plaintiff, the Court found that there was a material dispute of fact in regard to substantive changes and infringement. The defendant's motion for summary judgment in regard to claims 1, 2, and 5 was granted, but the remainder of the motion in regard to claims 3 and 4 was denied by the Court on June 24, 1994.

Therefore, the Court finds that the plaintiff's motion to amend is proper, because if, in fact, claims 3 and 4 were not substantially the same, and did have substantive changes during re-examination, there would be no infringement in this case. Accordingly, it is hereby **ORDERED** that the plaintiff's motion to amend page 30 of the judgment to reflect that the Court finds that claims 3 and 4 were substantially identical in scope after re-examination is **GRANTED,** and the judgment is hereby **AMENDED.** [Doc. 348].

### *PREJUDGMENT INTEREST*

The parties have agreed that prejudgment interest awardable to Minco is $4,540,313.00. Accordingly, it is hereby **ORDERED** that a judgment for $4,540,313.00 in prejudgment interest is awarded to Minco.

### *ATTORNEYS' FEES*

■ After careful review of the plaintiff's petition for attorneys' fees, the Court finds the amounts for attorneys' fees and litigation expenses documented in Minco's petition are reasonable given the length and complexity of this litigation, and that Minco is entitled to an award of $1,569,224.47 in attorneys fees, plus $176,382.32 in litigation expenses which Minco is entitled to recover as part of a Section 285 award under the holding in *Mathis v. Spears*, 857 F.2d 749, 757–59 (Fed. Cir.1988). The Court will not reduce these fees by the amount claimed to have been expended on re-examination, because the Court finds that the re-examination proceedings replaced the district court litigation for a period of time, and that the re-examination proceedings were instituted to shorten or to "possibly obviate the need for a trial." *PPG*

*Industries v. Celanese Polymer Specialties Co.,* 840 F.2d 1565, 1568 (Fed.Cir.1988). In fact, as noted in this order, after re-examination, there was no need for this Court to try the issue of infringement in regard to claims 1, 2 and 5.

The Court also finds that this case does not involve such an abuse of the judicial process to warrant an award of expert witness fees or prejudgment interest on attorneys' fees awarded under Section 285. Therefore, Minco will not be awarded a sum for expert witness fees other than those that are permissible under the bill of costs, and Minco will not receive prejudgment interest on its Section 285 award of attorneys' fees.

### *CONCLUSION*

It is hereby **ORDERED** that judgment is entered for the plaintiff against the defendant for $4,540,313.00 in prejudgment interest, and for $1,569,224.47 in attorneys' fees plus $176,382.32 in litigation expenses under Section 285.