**COMBUSTION ENGINEERING, INC., Plaintiff,**

v.

**IMETAL, Defendant.**

**Imetal, Counter-claimant,**

v.

**Asea Boveri Brown, Inc., and Combustion Engineering, Inc., Counter–Defendants.**

**No. 97 CIV. 3146(VM).**

United States District Court, S.D. New York.

Aug. 15, 2001.

Daniel J. Kornstein, Kornstein, Veisz & Wexler, Daniel J. Kornstein, Kornstein, Veisz & Wexler, L.L.P., New York City, for plaintiffs.

Steven Alan Reiss, Weil, Gotshal & Manges, Richard J. Davis, Weil, Gotshal & Manges, New York City, James R. Atwood, Covington & Burling, Washington, DC, for defendants.

## AMENDED DECISION AND ORDER

MARRERO, District Judge.

Combustion Engineering, Inc. ("CE") brought this action, invoking the Court's diversity jurisdiction, against Imetal for breach of contract and unjust enrichment. Imetal asserted counterclaims against CE and its parent, Asea Brown Boveri, Inc. ("Asea"), for breach of representation and

warranty, breach of implied covenant of good faith and fair dealing, and indemnification. CE and Asea now move pursuant to Fed.R.Civ.P. 56(b) for summary judgment, and Imetal cross-moves for summary judgment. For the reasons discussed below, CE's and Asea's motion is granted, and Imetal's cross-motion is denied.

## BACKGROUND

In May 1990, CE and Imetal entered into a stock purchase agreement (the "Agreement") whereby CE agreed to sell to Imetal the stock of several corporations, including Tennessee Electro Minerals, Inc. ("TECO"). The sale was consummated in August 1990. Declaration of Mark S. Ouweleen (counsel for CE and Asea) in Support of CE's Motion for Summary Judgment ("Ouweleen Decl."), Sep.App. Vol. I, Ex. 1 (the Agreement).

The Agreement provided that Imetal would assume a portion of liability arising from the "Minco Patent Litigation," a lawsuit brought by Minco, Inc. against CE for patent infringement regarding a rotary kiln that TECO used in the production of fused silica, and which at the time was pending in the Eastern District of Tennessee. Specifically, the Agreement provided, in pertinent part, that:

> [Imetal] shall assume ... all obligations of [CE] ... as to which [Imetal] has received written notice from [CE] in any way relating to any [acquired company] ... including, but not limited to ... (iii) any action, suit, or proceeding involving [CE] ... (including, without limitation, that portion of the Damages relating to the Minco litigation not indemnified by [CE] pursuant to section 12.1(c) hereof). To the extent that [CE] and its Affiliates ... are not relieved of such liabilities, [Imetal] shall defend, indemnify and hold harmless [CE] ... against and in

respect of such liabilities as provided in Article 12.

Agreement § 8.6(a) at 45.

CE, pursuant to § 12.1(c), agreed to indemnify Imetal for up to 80 percent of all damages Imetal incurred in connection with the Minco Patent Litigation, this obligation not to exceed $8 million:

> [CE] agrees to defend, indemnify and hold harmless [Imetal] ... against and in respect of ... (c) 80% of all Damages, including, without limitation, reengineering costs, suffered or incurred by [Imetal] ... in connection with the Minco patent infringement litigation referred to on Schedule 6.8, it being understood and agreed that [CE] shall have no obligation under this agreement to indemnify [Imetal] for more than $8,000,000 by reason of such litigation.

Agreement § 12.1(c) at 57.

The Agreement also provided that Imetal would indemnify CE for "any and all actions, suits, proceedings, claims, liabilities, demands, assessments, judgments, costs and expenses, including reasonable attorney's fees ... incident to any of the foregoing or such indemnification." Agreement § 12.2(c) at 59.

The Minco Patent Litigation resulted in a judgment against CE for $30,429,373. *See Minco v. Combustion Engineering*, 903 F.Supp. 1204 (E.D.Tenn.1995), *aff'd*, 95 F.3d 1109 (Fed.Cir.1996). Ultimately, CE and Minco settled for $29.4 million. Ouweleen Decl. Sep.App. Vol. III, Ex. 63 (letter from John Brett to Richard Davis dated Nov. 22, 1996). In November 1996, CE demanded indemnification from Imetal pursuant to the Agreement for the amount by which the settlement exceeded $8 million. Imetal refused to pay, contending that CE had breached certain provisions of the Agreement. *See Id.* Ex. 64 (letter from Richard Davis to John Brett dated November 25, 1996).

In July 1990, Minco had filed a related lawsuit against CE, in the Greeneville County Circuit Court in Tennessee, alleging theft of trade secrets relating to the rotary kiln patent technology. The case was stayed pending resolution of the Minco Patent Litigation and ultimately settled as part of that agreement.

Following its success against CE, Minco promptly filed suit against TECO seeking damages for the period following Imetal's acquisition of TECO. Declaration of Jennifer L. Plitsch (Counsel for Imetal) in Support of Cross–Motion for Summary Judgment ("Plitsch Decl."), Sep.App. Vol. I Ex. 16 (Compl., *Minco, Inc. v. Tennessee Electro Minerals, Inc.*, No. 2:95–CV–355 (E.D.Tenn. Sep. 27, 1995)). Ultimately, TECO settled with Minco by paying about $12 million for a 40 percent non-controlling blind trust interest in Minco.

This lawsuit followed. CE claimed breach of contract on the theory that the Agreement clearly required that Imetal "pay for damages and costs arising out of the Minco Patent Litigation, to the extent that those damages and costs exceed $8 million." Memorandum in Support of Motion for Summary Judgment for CE and Asea ("Pl.'s Mem.") at 5. Imetal countered, both as an affirmative defense and counter-claim, that CE breached representations and warranties delineated in §§ 6.5 and 6.14 of the Agreement, and therefore, pursuant to § 8.6(d), it was relieved of any obligation to indemnify CE. Specifically, Imetal asserted that CE represented that it possessed the right to use the rotary kiln that was the subject of the Minco Patent Litigation. *See* Memorandum in Support of Imetal's Cross–Motion for Summary Judgment and in Opposition to the Motion of CE and Asea for Summary Judgment ("Def.'s Mem.") at 14. As set forth in the Agreement:

Each company owns or possesses adequate licenses or other rights to use all patents, patent applications, trademarks, trademark applications ... necessary for the operation of its business as presently conducted ... the absence of which is not reasonably likely to have a Material Adverse Effect.... Except as set forth on Schedule 6.14, [CE] has no knowledge of any claim or liability for trademark, trade name, patent or copyright infringements as to any products manufactures or sold in the business of any Company, other than infringements which, in the aggregate, have not had and are not reasonably likely to have a Material Adverse Effect.

Agreement § 6.14 at 27.

Imetal also claimed that CE was obligated to indemnify it for the re-engineering costs incurred as a result of the Minco Patent Litigation and for the amounts paid by Imetal to settle the patent infringement suit brought in 1995 by Minco against TECO.

Finally, Imetal claimed that even if the Court finds that Imetal is responsible for indemnifying CE for damages exceeding $8 million, there remains an issue of fact regarding CE's conduct at the settlement discussions with Minco. Imetal argues that CE failed to make good faith efforts to settle the Minco litigation for a reasonable amount. *See* Def.'s Mem. at 20.

CE and Asea now move for summary judgment pursuant to Fed.R.Civ.P. 56(b) and Imetal cross-moves for summary judgment.

*DISCUSSION*

 Summary judgment may be granted only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct.

2548, 91 L.Ed.2d 265 (1986). Under New York law, to establish a breach of contract a plaintiff must plead and prove the following elements: (i) the existence of a contract; (ii) breach by the other party; and (iii) damages suffered as a result of the breach. *See First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162 (2d Cir. 1998). Summary judgment is appropriate in a breach of contract action where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning. *See Fulton Cogeneration Assoc. v. Niagara Mohawk Power Corp.*, 84 F.3d 91, 98 (2d Cir.1996). Contract language is unambiguous when it has " 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.' " *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.1989) (quoting *Breed v. Ins. Co. of North America*, 46 N.Y.2d 351, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978)).

The plain language of the Agreement sets forth a clear promise by Imetal (1) to assume all liabilities of CE as to which Imetal has received written notice "including, without limitation, that portion of the damages relating to the Minco litigation not indemnified by [CE] pursuant to Section 12.1(c)," Agreement § 8.6(a) at 45, and (2) to "defend, indemnify and hold harmless [CE] against and in respect of . . . any and all actions, suits, proceedings, claims, liabilities, demands, assessments, judgments, costs and expenses including reasonable attorneys' fees," Agreement § 12.2(c) at 59.

There is nothing ambiguous about either of these provisions. Imetal agreed to assume a specified portion of CE's liability arising from the Minco Patent Litigation. It is undisputed that CE paid $29.4 million to settle the Minco Patent Litigation, and that Imetal has refused to indemnify CE pursuant to the terms of the Agreement.

■ Imetal's defense to the breach of contract claim fails as a matter of law. Imetal asserts that § 8.6(a) of the Agreement, relied upon by CE, must be read in conjunction with § 8.6(d). According to Imetal, "the plain language of Section 8.6(d) dictates that Imetal has no obligation to indemnify CE for liabilities arising from CE's own breach of representation and warranty." Def.'s Mem. at 6. Section 8.6(d) of the Agreement states:

> Notwithstanding anything contained herein to the contrary, [Imetal] shall have no obligation to indemnify [CE] in respect of those liabilities against which [CE] has agreed to indemnify a Buyer indemnitee [Imetal included] pursuant to this agreement (including, without limitation, indemnification by reason of a breach of representation and warranty . . .)

Agreement § 8.6(d) at 47.

Section 8.6(d), put simply, relieves Imetal of any obligation to indemnify CE for any particular liability against which CE has agreed to indemnify Imetal—including, as delineated in § 12(c) of the Agreement, up to 80 percent of all damages Imetal incurred in connection with the Minco Patent Litigation, not to exceed $8 million. Thus, this provision contains a precondition that qualifies the extent to which Imetal may circumscribe its indemnification obligations to CE. It is limited to Imetal not incurring liabilities or portions of liabilities that CE itself has undertaken to assume. Section 8.6(d) cannot relieve Imetal more broadly of any obligation to indemnify CE for breaches of representations or warranties beyond those CE has specifically accepted. Therefore, regardless of whether CE made or breached any warranties concerning the rotary kiln or the Minco Patent Litigation, Imetal is not,

by operation of the Agreement, excused from its assumption of liability that CE has not assumed. At most, § 8.6(d) excuses Imetal from indemnifying CE for the $8 million of Minco Patent Litigation damages for which CE agreed to indemnify Imetal. Section 8.6(d) has no applicability to any Minco Patent Litigation damages over $8 million, because § 12.1(c) expressly provides that CE has not agreed to indemnify Imetal for those damages.

■ Imetal's counter-claim for breach of representations and warranties fares no better than its defense. Imetal essentially argues that CE breached the representation and warranty in § 6.14 that it possessed rights to all intellectual property necessary for the operation of the TECO business, including the rotary kiln patent, and is therefore liable to indemnify Imetal for the alleged costs incurred to settle the suit Minco brought against TECO in 1995.[1] However, it is undisputed that the Agreement provides that the alleged warranty concerning Minco expired at most a year after closing. Under § 12.3 of the Agreement, CE had no obligation to indemnify Imetal for the breach of expired representations and warranties. Imetal concedes that the expiration of the warranties and representations means "that CE could no longer be sued by Imetal for breaching them." Focusing on the phrase "[n]otwithstanding anything contained herein to the contrary" in § 8.6(d), Imetal argues that the time limitation is inapplicable to "the Agreement's provisions concerning the terms in Section 8.6 under which Imetal assumed CE's preexisting liabilities." Memorandum in Support of Imetal's Cross-motion for Summary Judgment and in Opposition to the Motion of CE and Asea for Summary Judgment ("Imetal's Mem."). The Court finds no basis for such a construction of the Agreement.

Section 8.6(d) says nothing at all that is contrary to the relevant expiration provisions of § 11.1, and § 12.3 provides that "[t]he liability of CE" under representations and warranties is limited to a one year period after closing. By contrast, as CE points out, § 8.6(d) does explicitly extend the survival of the environmental representations in § 6.15, which would otherwise expire in one year under § 11.1. The environmental representations therefore survive three years for § 8.6(d) purposes notwithstanding the survival provision to the contrary in § 11.1. This reading of these provisions further evinces that § 8.6(d) was not intended to extend the date for the assertion of the representations and warranties Imetal relies upon. Because the asserted representations expired long before Imetal raised them, § 8.6(d) has no application and Imetal's defenses and claims based on their alleged breach are barred as a matter of law.

In addition, § 6.8 states that "[e]xcept as set forth on Schedule 6.8, there is no ... suit ... which is reasonably likely to have a Material Adverse Effect." And the last sentence of § 6.14 states that "[e]xcept as set forth on Schedule 6.14, [CE] has no knowledge of any claim for ... patent infringement ... other than infringement which ... are not reasonably likely to have a Material Adverse Effect." Both Schedules 6.8 and 6.14 list the Minco Patent Litigation. The Agreement thus clearly excepts the Minco Patent Litiga-

---

**1.** Section 6.14 provides in pertinent part: "[e]ach company owns or possesses adequate licenses or other rights to use all patents, patent applications, trademarks, trademark applications... necessary for the operation of its business as presently conducted... the ab- sence of which is not reasonably like to have a Material Adverse Effect... Except as set forth on Schedule 6.14." Agreement § 6.14 at 27 (emphasis added). The referenced schedule 6.14 listed the Minco Patent Litigation.

tion from the representations in §§ 6.8 and 6.14, giving notice to Imetal that the Minco Patent Litigation might have a Material Adverse Effect, and that CE did not warrant that it would not have such an effect.

■ Imetal asserts that § 6.5[2] was breached because CE did not disclose the "material nature of the potential liability" and that § 6.14 warranted the ownership of intellectual property rights, including that at issue in the Minco Patent Litigation, the absence of which would be reasonably likely to have a Material Adverse Effect. This reading again contradicts the notice in §§ 6.8 and 6.14 that the Minco Patent Litigation could result in a Material Adverse Effect. Additionally, the opening sentence in Article 6, which precedes and applies to all the subsequent sections in Article 6, provides "[e]xcept as otherwise set forth in *any* Schedule attached hereto, Seller represents and warrants to Buyer that. . . ." Agreement at 14 (emphasis added).

■ Imetal also contends that the exception clauses in §§ 6.8 and 6.14 do not create exclusions for the Minco Patent Litigation, because schedules 6.8 and 6.14 merely "identified" the litigation, and do not specifically "set forth that it is an exception to the warranties in §§ 6.8 and 6.14." Again, a plain reading of §§ 6.8 and 6.14 does not permit such a construction. Each section, qualified by the clause "[e]xcept as set forth on" their respective schedules, asserts that there is no litigation likely to have a Material Adverse Effect. Both relevant schedules list the Minco Patent Litigation. The parties clearly intended the Minco Patent Litigation to be

excepted from the warranties otherwise made in §§ 6.8 and 6.14.

■ Finally, Imetal argues that if CE's interpretation of the Agreement is adopted, then CE breached a duty to settle the Minco Patent Litigation in good faith. This duty, it asserts, arises from CE's maintaining control of litigation and settlement. Since there are disputed facts with regard to CE's conduct at settlement discussions, Imetal argues, a trial is required. *See* Def.'s Mem. at 21.

The threshold issue is whether CE had any duty to act in good faith on behalf of Imetal at the settlement negotiations of the Minco Patent Litigation. CE argues that under New York law, insurance companies have no duty of good faith in settlement unless there is a basis in the contract for that duty, such as a provision conferring exclusive control over settlement. *See Forest Ins. Co. v. American Motorists Ins. Co.*, No. 89 Civ. 4326, 1994 WL 97138, at *9 (S.D.N.Y. March 21, 1994) (emphasis added). Imetal counters that § 8.6 of the Agreement can be read to create such a duty. *See* Def.'s Mem. at 21, n. 24. Nowhere in § 8.6, however, did the parties indicate a duty on the part of CE to exert reasonable efforts on behalf of Imetal at the settlement negotiations of the Minco Patent Litigation. *See* Agreement at 45.

Nevertheless, there is some case law which suggests that a reasonable good faith standard applies to an indemnitee's settlement efforts, coupled with the indemnitor having notice of the claim. *See, e.g., Fidelity Nat'l Title Ins. Co. v. First New York Title & Abstract Ltd.*, 269 A.D.2d 560, 707 N.Y.S.2d 112 (2000) ("When an indemnitor has notice of the claim against

---

**2.** That section provides: "Except as disclosed in, respectively, the 1989 Financial Statements or the 1990 First Quarter Financial Statement or *any* schedule hereto, as of December 31, 1989 and March 31, 1990, respec-

tively, there were no actual or contingent debts, liabilities or obligations of any of the Companies which were required by the Accounting Principles to be disclosed." Agreement § 6.5 at 17.

it, the general rule is that the indemnitor will be bound by any reasonable good faith settlement the indemnitee might thereafter make."); *Goldmark Indus. v. Tessoriere,* 256 A.D.2d 306, 307, 681 N.Y.S.2d 327 (1998). However, even assuming that CE owed a duty to Imetal to settle in good faith, Imetal cannot establish that CE breached that duty. CE's attorney, John Brett, continually informed Imetal of all offers and demands being made during negotiations. *See* Ouweleen Decl., Ex. 57–64. When Brett requested Imetal's views on the maximum acceptable settlement amount, Imetal merely replied that "it would be appropriate for you to attempt to reach a final settlement at the lowest possible cost." *Id.* Ex. 59, 61.

Moreover, Imetal's contention that the settlement amount of $29.4 million was unreasonable is without merit. CE was subject to a judgment exceeding $30 million, which had been affirmed on appeal. Imetal has failed to adduce evidence sufficient to raise any triable issue with respect to the reasonableness of the settlement amount. The Court also rejects Imetal's assertion that a trial is necessary to determine what portion of the $29.4 million paid to settle the Minco Patent Litigation judgment should be reasonably allocated to the trade secrets case. There is no material issue with respect to the settlement value of the trade secrets case. Minco's counsel, Clare Nordquist, testified in her deposition that she would not have settled the Minco Patent Litigation for less then $29.4 million, that the negotiations leading to the $29.4 million figure were focused on the Minco Patent Litigation alone, and that the trade secrets suit was brought up "at the very last minute," as "an appendage, kind of an incidental." Ouweleen Decl. Ex. 87 at 51–52, 54. Based on these undisputed facts, no fair-minded jury could reasonably find for Imetal on this issue.

## *ORDER*

For the foregoing reasons, it is

**ORDERED** that the Court's Order dated June 29, 2001 is amended to incorporate the discussion contained herein; and it is further

**ORDERED** that Combustion Engineering's and ASEA's motion for summary judgment is granted; and it is further

**ORDERED** that Imetal's motion for summary judgment is denied; and it is further

**ORDERED** that the Clerk of Court enter judgment in favor of Combustion Engineering, Inc. and Asea Brown Boveri, Inc. and against Imetal for $21.4 million plus reasonable attorneys' fees pursuant to 12.2(c) of the Agreement, the amount of such fees to be stipulated by the parties within thirty (30) days of the date of this Amended Decision and Order, and it is further

**ORDERED** that in the event the parties are unable by stipulation to establish the amount of reasonable attorneys' fees as set forth above they are directed to stipulate to a briefing schedule on the issue of attorneys' fees within thirty (30) days of the date of this Decision and Order, and to submit said schedule to the Court for endorsement.

**SO ORDERED.**