## COMBUSTION ENGINEERING, INC., Plaintiff,

v.

## IMETAL, Defendant,

### No. 97 CIV. 3146.

United States District Court, S.D. New York.

Nov. 20, 2002.

Decision and Order on Grant of Reconsideration Jan. 6, 2003.

---

Daniel J. Kornstein, Kornstein, Veisz & Wexler, New York City, for Plaintiff.

Steven Alan Reiss, Richard J. Davis, Weil, Gotshal & Manges, New York City, James R. Atwood, Covington & Burling, Washington, DC, for Imetal.

## DECISION AND ORDER

MARRERO, District Judge.

Combustion Engineering, Inc. ("CE") brought this action, invoking the Court's diversity jurisdiction, against Imetal for breach of contract and unjust enrichment. Imetal asserted counterclaims against CE and its parent, Asea Brown Boveri, Inc. ("Asea"), for breach of representation and warranty, breach of implied covenant of good faith and fair dealing, and indemnification. CE and Asea moved for summary judgment, and Imetal cross-moved for summary judgment. By Decision and Order dated August 15, 2001, this Court granted CE's motion for summary judgment on its claims and denied Imetal's motion for summary judgment on its counterclaims. *See Combustion Eng'g v. Imetal,* 158 F.Supp.2d 327 (S.D.N.Y.2001) ("*Combustion Eng'g I*"). By summary order dated June 18, 2002, the Second Circuit Court of Appeals affirmed this Court's decision in part, vacated in part and remanded for further findings of law and fact, while retaining jurisdiction of the case pursuant to *United States v. Jacobson,* 15 F.3d 19 (2d Cir.1994). *See Combustion Eng'g v. Imetal,* 37 Fed. Appx. 573 (2d Cir.2002) ("*Combustion Eng'g II*"). The parties have made submissions on the remanded issues. For the reasons set forth below, this Court makes the following findings as directed by the Second Circuit: (1) CE did not have a duty to act in good faith on behalf of Imetal at settlement negotiations; and (2) Imetal's letter dated June 6, 1990 did constitute notice of its indemnification claim, thus tolling the expiration of the relevant representation and warranty.

## I. BACKGROUND [1]

This case arises out of a stock purchase agreement entered into in May 1990 between CE and Imetal (the "Agreement"), whereby CE agreed to sell to Imetal the stock of several corporations, including Tennessee Electro Minerals, Inc. ("TECO").[2] The Agreement provided that Imetal would assume a portion of the liability arising from the "Minco patent litigation," which term in the Agreement specifically referred to a lawsuit brought by Minco, Inc. ("Minco") against CE for patent infringement regarding a rotary kiln that TECO used in the production of fused silica. That litigation was pending at the time in the Eastern District of Tennessee ("*Minco v. CE*"). (*See* JA 255.)[3] CE agreed, pursuant to § 12.1(c) of the Agreement, to indemnify Imetal for up to 80 percent of all damages Imetal incurred in connection with the Minco patent litigation, with an upward cap of $8 million. *Minco v. CE* resulted in a judgment against CE for $30,429,373. *See Minco v. Combustion Eng'g,* 903 F.Supp. 1204 (E.D.Tenn.1995). The case was settled for $29.4 million.

After its success against CE, Minco filed suit in 1995 against TECO seeking damages for the period following Imetal's acquisition of TECO ("*Minco v. TECO*"). (*See* JA 1157–69.) Ultimately, TECO set-

1. The factual summary that follows derives primarily from Combustion Engineering and Asea Brown Boveri's Opening Memorandum on Remand, dated August 23, 2002 ("CE Mem."), and Imetal's Opening Memorandum on Remanded Issues, dated July 19, 2002 ("Imetal Mem."). Except where specifically referenced, no further citation to these sources will be made.

2. A more detailed summary of the factual background can be found in *Combustion Eng'g, I,* 158 F.Supp.2d at 329–330.

3. JA cites refer to relevant page or pages of the Joint Appendix filed by the parties with their briefs on appeal, which the parties have submitted to this Court with their memoranda of law on remanded issues.

tled with Minco by paying about $12 million for a 40 percent non-controlling blind trust interest in Minco.

When Imetal refused to pay CE for the amount of damages in *Minco v. CE* exceeding the $8 million cap, CE filed a lawsuit in this Court claiming breach of contract on the theory that the Agreement clearly required that Imetal pay the damages in *Minco v. CE* in the amount exceeding $8 million. In defense, Imetal claimed that its indemnity obligations in the contract were nullified by CE's breach of representations and warranties in the agreement.

Imetal also filed a counter-claim alleging that CE breached representations and warranties in the Agreement and was therefore obligated to indemnify Imetal for the amounts paid to settle the patent infringement suit brought in 1995 by Minco against TECO. CE countered that schedules 6.8 and 6.14, exempting the Minco patent litigation from the representations and warranties in the Agreement, preclude Imetal's counterclaim. Furthermore, CE alleged that as to *Minco v. TECO,* the warranties in § 6.14 had expired pursuant to § 12.3(b) of the Agreement, which provided a one year limit on the representations and warranties in § 6 unless notice of a claim was given within the year. Imetal argued that a letter sent on June 6, 1990 ("1990 Letter"), referring CE to a letter sent by Minco indicating that it intended to hold TECO liable for its use of the allegedly infringing patent it was purchasing from CE, constituted notice sufficient to toll the relevant warranty. (JA 1235–36) CE disputed the adequacy of the notice provided in the 1990 Letter.

Finally, Imetal claimed that even if the Court finds that Imetal is responsible for indemnifying CE for damages exceeding $8 million, CE failed to make good faith efforts to settle the Minco patent litigation for a reasonable amount and thus Imetal's indemnity obligations should be adjusted to account for this failure.

CE and Asea moved for summary judgment pursuant to Fed.R.Civ.P. 56(b) on its breach of contract claims, and Imetal cross-moved for summary judgment on its counterclaim. This court granted CE's motion for summary judgment and denied Imetal's cross-motion on its counterclaim. *See Combustion Eng'g I,* 158 F.Supp.2d 327. Specifically, this Court held that (i) Imetal was obligated to indemnify CE for the Minco patent litigation under the terms of the Agreement; (ii) while a duty of good faith might lie under the Agreement, based on the undisputed facts, Imetal cannot establish that CE breached that duty; and (iii) CE did not breach the representations and warranties in the Agreement because the allegedly breached warranty expired one year after closing, and because the Agreement excepts the Minco patent litigation from the representations in § 6.14 through disclosure in schedules 6.8 and 6.14 of the Agreement.

Imetal appealed this Court's decision to the Second Circuit Court of Appeals. In a Summary Order, the Circuit Court affirmed this Court's judgment in part, vacated in part, and remanded. *See Combustion Eng'g II,* 37 Fed.Appx. 573. The Second Circuit vacated this Court's judgment on the issue of whether CE breached a duty to settle the Minco patent litigation in good faith and on the issue of whether CE and Asea breached their representations and warranties as alleged in Imetal's counterclaim. On remand, the Circuit directed this Court to fully consider in the first instance: (i) whether CE had a duty under the Agreement to act in good faith on behalf of Imetal at the settlement negotiations of *Minco v. CE,* and, if so, to determine whether, considering the relevant factual record, CE breached that

duty; and (ii) whether the 1990 Letter constitutes notice under the Agreement, thereby tolling the expiration of the warranty in § 6.14.

## II. DISCUSSION

### A. DUTY TO ACT IN GOOD FAITH

■ The first question posed by the Second Circuit is the legal question of whether Combustion Engineering had a duty to act in good faith on behalf of Imetal at the settlement negotiations of the Minco patent litigation.

Imetal urges that the requirement to act in good faith on behalf of a third party at settlement negotiations, which arises frequently in the context of insurance contracts, should apply here. Under New York law, there is a direct obligation placed on the primary insurer to conduct settlement negotiations in good faith on behalf of the insured: "The notion that an insurer may be held liable for the breach of its duty of 'good faith' in defending and settling claims over which it exercises exclusive control on behalf of its insured is an enduring principle, well settled in this State's jurisprudence." *Pavia v. State Farm Ins. Co.,* 82 N.Y.2d 445, 605 N.Y.S.2d 208, 626 N.E.2d 24, 26–27 (N.Y. 1993) (citations omitted); *see also Forest Ins., Ltd. v. American Motorists Ins. Co.,* No. 89 Civ. 4326, 1994 WL 97138, at *12 (S.D.N.Y. March 21, 1994).

The New York State Court of Appeals has recognized that a primary insurer owes fiduciary duties to an excess insurer. *See Hartford Accident and Indem. Co. v. Michigan Mut. Ins. Co.,* 61 N.Y.2d 569, 475 N.Y.S.2d 267, 463 N.E.2d 608, 610 (N.Y.1984); *St. Paul Fire and Marine Ins. Co. v. United States Fidelity and Guaranty Co.,* 43 N.Y.2d 977, 404 N.Y.S.2d 552, 375 N.E.2d 733, 734 (N.Y.1978). Those duties are derived from "the same fiducia-ry obligation which the primary insurer owes to its insured, namely, a duty to proceed in good faith and in the honest exercise of discretion, the violation of which exposes the primary carrier to liability beyond its policy limits." *Hartford Accident and Indem. Co. v. Michigan Mut. Ins. Co.,* 93 A.D.2d 337, 462 N.Y.S.2d 175, 178 (App. Div. 1st Dep't 1983). In *Forest,* the court explains that "the rationale of *Pavia* subsumes that a primary carrier charged with bad faith had a first party contractual duty to its policy holder to negotiate settlement in good faith which carries over to the excess insurer." 1994 WL 97138, at * 13. "This duty of good faith stems from the 'inherent conflict' between the primary insurer's desire to settle the claim for as little as possible and the excess insurer's desire to avoid liability." *Federal Ins. Co. v. Liberty Mutual Ins. Co.,* 158 F.Supp.2d 290, 294 (S.D.N.Y. 2001) (citing *Smith v. Gen. Accident Ins. Co.,* 91 N.Y.2d 648, 674 N.Y.S.2d 267, 697 N.E.2d 168 (N.Y.1998) (insurer's failure to inform insured of settlement offers evidenced bad faith).

Here, since as to the first $8 million of liability CE is 80 percent liable, but thereafter the entire burden falls on Imetal, under the terms of the Agreement, the indemnification provisions essentially create a situation wherein Imetal can be likened to an excess insurer and CE a primary insurer. Similar to a primary insurer's relationship to an excess insurer, CE engaged in litigation settlement negotiations in which it had liability only up to a certain limit, the remainder of which would be borne by a third party, who, as evidenced by the record, was often not present.

However, despite the possible analogy to a primary insurer and excess insurer, in this case the duty to act in good faith at settlement negotiations does not pertain to

CE for two reasons. First, because there is no provision in the parties' Agreement that, unlike the typical insurance contract, specifically imposes a duty on CE to conduct settlement negotiations on Imetal's behalf, there is no explicit duty to conduct settlement negotiations in good faith. Second, since it is uncontested that CE did not retain exclusive control of the settlement negotiations, the analogy to insurance contracts fails in a crucial respect.

Every contract contains an implied covenant of good faith and fair dealing. *See Uniform Commercial Code § 1–203; Restatement (Second) of Contracts § 205* (the obligation of good faith may not be disclaimed by agreement); *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 412 N.Y.S.2d 827, 385 N.E.2d 566, 569 (N.Y.1978). A breach of the covenant of good faith is considered to be a breach of the underlying contract. *See Wolff v. Rare Medium*, 210 F.Supp.2d 490, 497 (S.D.N.Y.2002) (citing *Fasolino Foods Co., Inc., v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir.1992)). However, as this Court has previously stated, "the obligation of good faith does not create obligations that go beyond those intended and stated in the language of the contract." *Wolff*, 210 F.Supp.2d at 497 (citing *Granite Partners L.P. v. Bear Stearns & Co. Inc.*, 17 F.Supp.2d 275, 305 (S.D.N.Y. 1998); *Gordon v. Nationwide Mut. Ins. Co.*, 30 N.Y.2d 427, 334 N.Y.S.2d 601, 285 N.E.2d 849, 854 (N.Y.1972) ("Bad faith requires an extraordinary showing of a disingenuous or dishonest failure to carry out a contract.")

The requirement that good faith obligations be tied to specific provisions of a contract has been stressed in the context of the good faith duty to settle derived from insurance contracts as well. *See, e.g., Certain Underwriters v. Fidelity and Cas. Ins. Co.*, 4 F.3d 541 (7th Cir.1993) (on

appeal from district court's summary judgment for the defendant primary insurer, the issue of primary insurer's liability to excess insurer for negligent refusal to settle lawsuit against their mutual insured turned on whether the primary insurer had a contractual duty to defend or settle the lawsuit); *Pavia*, 605 N.Y.S.2d 208, 626 N.E.2d at 26. For instance, in *Forest*, the insurance policy at issue was unlike the standard general liability policy, in that under American Motorists Insurance Company's ("AMICO") policy the insurer had the " 'right *but not the duty* to investigate claims, defend suits and tender payments in settlement of claims.' " 1994 WL 97138, at *10 (emphasis in original). Because of this condition the court found that the duty to conduct settlement negotiations in good faith inherent in ordinary insurance contracts did not apply. Therefore, the issue for consideration by this Court is whether the Agreement creates an obligation to settle to which the implied covenant of good faith would apply.

In *Forest*, the plaintiff contended that defendants' duty to negotiate settlement in good faith was predicated on the right to conduct settlement negotiations. *Id.* But the court would not allow a duty to settle to be inferred from the right. The *Forest* court noted: "It is legally significant that neither of the defendants had any contractual duty whatever to IPC to attempt to negotiate a settlement in [this] case. If neither defendant had a contractual duty concerning settlement to [primary insurer], as a matter of law there could be no cause of action ... for breach of a direct duty to settle or for wrongful refusal to settle." 1994 WL 97138, at *11. (citations omitted).

In this case, under § 12.1(c) of the Agreement, it is unclear as to whether the parties contemplated that CE would even have a right to control the defense, compromise or settlement of the *Minco v. CE*

litigation.[4] In any event, Imetal does not point to any duty to defend or settle *Minco v. CE* imposed upon CE by the Agreement. Therefore, since no explicit contractual duty to settle the *Minco v. CE* claim was placed upon CE, CE can not be held to a good faith duty to settle that claim.

Furthermore, this case can be distinguished from the typical insurance contract situation because exclusive control of settlement is a central factor in determining that the good faith duty applies to insurance contracts. In *Pavia* the Court of Appeals of New York explained that: "At the root of the 'bad faith' doctrine is the fact that insurers typically exercise complete control over the settlement and defense of claims against their insureds, and, thus, under established agency principles, may fairly be required to act in the insured's best interest." 605 N.Y.S.2d 208, 626 N.E.2d at 27 (citing 7C Appleman, *Insurance Law and Practice* § 4711 [Berdal ed]). The fact that CE did not have the right to negotiate a settlement in the Minco patent litigation without the consent of Imetal pursuant to § 12.1 of the Agreement, (JA 203), and that neither CE nor Imetal had exclusive control over the nego-

tiations,[5] is legally significant; exercising de facto control over the negotiations does not confer the same obligations as possessing the exclusive right to conduct settlement negotiations.

In sum, the duty to settle in good faith must derive from or be linked to some contractual provision that creates such an obligation; this Court can not agree with Imetal's contention that the general covenant of good faith inherent in all contracts is sufficient here to create a good faith obligation to settle.[6] In this case, Imetal had the right and therefore, the obligation to protect itself during settlement negotiations, particularly as it became evident that liability might exceed the cap. Under the circumstances, Imetal was not entitled to relegate to CE the responsibility to defend the suit and assume, without an explicit contractual basis for that assumption, that CE had a fiduciary-like obligation to act in good faith on Imetal's behalf.

## B. *NOTICE OF A BREACH OF REPRESENTATION AND WARRANTIES*

The second issue on remand is whether the 1990 Letter constituted notice suffi-

---

4. Section 12.1 of the Agreement contemplates that "[CE] shall have the right within ten days after receipt of such notice to assume the control of the defense." (JA 203.) However, it is unlikely that this control provision applied to *Minco v. CE* because that litigation was ongoing at the time of the Agreement and therefore no notice would have been contemplated. Furthermore, a separate provision for designating expenditures was included in the Agreement to cover the Minco patent litigation. As a matter of practicality, it is evident that because CE was the named defendant in Minco v. CE, and prior to the Agreement CE was handling the defense, and because it was not expected by CE that damages would exceed the cap, it was reasonable for CE to have continued control of the defense. However, Imetal has pointed to no other provision in the Agree-

ment that assigns to CE the duty or right, for that matter, to control the defense of the *Minco v. CE* lawsuit.

5. In fact, it is evident from the record that Imetal did engage in some settlement negotiations with Minco concerning the *Minco v. CE* claim without CE being present, just as CE acted without Imetal's presence. *See* JA 660–61.

6. While in their initial opposition to summary judgment, Imetal argued that § 8.6 of the Agreement created such a duty, this Court rejected that argument in its earlier decision and Imetal seems to have abandoned it on remand. *See Combustion Eng'g I*, 158 F.Supp.2d at 333.

cient to toll the warranty in § 6.14 pursuant to § 12.3(b). *See Combustion Eng'g II*, 37 Fed.Appx. at 575. In its counterclaim for breach of representations and warranties, Imetal essentially argues that CE breached the representation and warranty in § 6.14 that it possessed rights to all intellectual property necessary for the operation of the TECO business, including the rotary kiln patent, and is therefore liable to indemnify Imetal for the alleged costs incurred to settle the suit Minco brought against TECO in 1995. *See Combustion Eng'g I*, 158 F.Supp.2d at 332. However, CE argues that pursuant to § 12.3 of the Agreement, the warranties in § 6 expired one year after closing on the Agreement. (*See* JA 205.) In defense of CE's claims that the warranties in § 6 have expired, Imetal argues that the Agreement provides an exception to the expiration for "Damages with respect to which [Imetal] has given [CE] written notice" before the expiration pursuant to § 12.3. (Imetal Mem. at 18; JA 205.) Imetal contends that the 1990 Letter constituted notice sufficient to toll the expiration of the warranty.

In its earlier decision, this Court rejected Imetal's counterclaim with regard to a breach of warranty based on the *Minco v. TECO* lawsuit on two separate and independent grounds: (i) the warranty in § 6.14 of the Agreement had expired pursuant to § 12.3 of the Agreement; and (ii) the notice in schedules 6.8 and 6.14 of the Agreement alerting Imetal to the possibility that the Minco patent litigation could have a "Material Adverse Effect," constituted sufficient disclosure to exclude the Minco claim against TECO from the warranty in § 6.14. *See Combustion Eng'g I*, 158 F.Supp.2d at 332–333.[7]

■ Without reversing the separate and independent ground this Court relied on for dismissing Imetal's counterclaim, the Second Circuit has vacated the judgment dismissing the counterclaim and has directed a finding as to the issue of whether the 1990 Letter was sufficient notice to toll the warranty. The Court maintains its previous holding dismissing Imetal's counterclaim on the separate ground that schedules 6.8 and 6.14 listing the *Minco v. CE* as exceptions to the warranties in §§ 6.8 and 6.14 also except the *Minco v. TECO* suit from the warranty provisions, since the two lawsuits are identical except that the latter was brought against TECO as the successor to the alleged infringing patent.[8] However, the Court agrees with Imetal that if the warranty provision in § 6.14 does pertain to the *Minco v. TECO* litigation, then no reasonable jury could

---

7. In other words, this Court held that the reference in schedules 6.8 and 6.14 excepting the *Minco v. CE* litigation from the warranties in §§ 6.8 6.14 was sufficient to also except Minco's related claim against TECO from the warranty in § 6.14.

8. While this Court finds no basis in the present posture of the case to reverse itself as regards to the alternate ground, and has no intention to do so, it will consider the issue of whether the 1990 Letter constituted notice tolling the warranty, as directed by the Second Circuit. In this regard, the Court must note that, absent an explicit determination that the second ground this Court articulated for dismissing Imetal's counterclaim in the

original decision was insufficient, the 1990 Letter issue should be deemed moot. *See Combustion Eng'g I*, 158 F.Supp.2d at 332–333. If this Court's alternate basis for dismissing Imetal's counterclaim were reversed by the Second Circuit, that ruling would entail a finding that the exception of *Minco v. CE* to the warranties in §§ 6.8 and 6.14 listed in schedules 6.8 and 6.14. does not cover Minco's continuing claim against TECO for infringement of the same patent. On the basis of this distinction, this Court considers the issue of notice, despite its holding to the contrary as to the applicability of the exceptions to the TECO litigation.

deny that the 1990 Letter was adequate notice of Minco's claim against TECO.

It is well established that unless otherwise specified by contract, no particular form of notice is required under New York law for an indemnitee's notice of a claim to his indemnitor. *See Prescott v. Le Conte*, 83 A.D. 482, 82 N.Y.S. 411, 414 (App. Div. 1st Dep't 1903); 23 *N.Y. Jur.2d Contribution, Indemnity and Subrogation* § 107 (2001) ("Where notice to the indemnitor is required or given, no particular form of words is necessary, nor is it even necessary that the notice be in writing.") The notice at issue here—notice of a claim to toll a warranty as opposed to the notice required for purposes of indemnification—similarly does not have any requirements as to form. Furthermore, as the Circuit Court noted, *Combustion Eng'g II*, 37 Fed.Appx. at 575, there is no indication in the Agreement as to any particular requirements of the notice specified in § 12.3. Therefore, the Court sees no reason that the 1990 Letter was not sufficiently specific and timely to provide notice to CE under the Agreement that Minco intended to sue TECO for infringing the same patent involved in *Minco v. CE* and, by that means, Imetal put CE on notice that Imetal would seek indemnification for Minco's claim.

Fundamentally, the importance of notice is based on the objective of giving an indemnitor the opportunity to defend or settle a claim. *See New York v. Blank*, 27 F.3d 783, 794 (2d Cir.1994) (describing reasons for notification provisions in insurance contracts); *cf. Carey Transportation, Inc. v. Greyhound Corp.*, 80 B.R. 646 (S.D.N.Y.1987) (where indemnitor is given notice of the claim and an opportunity to approve a proposed settlement or to take over the defense, the standard of proof necessary to receive indemnification for settlement without judicial finding of liability is reduced from actual liability to potential liability); *Atlantic Richfield Co. v. Interstate Oil Transport*, 784 F.2d 106, 113 (2d Cir.1986) ("If the indemnitor declines either to approve the settlement or to take over the defense, the indemnitee is required to prove only its potential liability to the plaintiff. Where notice—which includes a meaningful opportunity to assume the defense—is lacking, a demonstration of actual liability is required.")

This basic reason for notice provisions is buttressed in the case at hand by the express language of the Agreement: § 12 provides that even failure to provide notice "shall not affect [Imetal's] right to indemnification hereunder, unless [CE's] interests are actually prejudiced thereby." (JA203.) While this provision is later modified by the one year limitation in § 12.3, (JA 205), it still indicates the purpose of the notice. It is uncontested that, based on the 1990 Letter, CE was well aware of Minco's intention to file a lawsuit against TECO before the warranty expired. Therefore, it is clear that CE had sufficient notice to act in its own interests to defend Minco's claim against TECO for patent infringement.

Furthermore, as a matter of logic, and under the terms of the contract, a claim need not be reduced to a specific damages judgment before notice of a claim is adequately given. "Damages" in § 12.1(a) of the Agreement is defined as "any and all losses, damages, deficiencies or liabilities." (JA202.) Further clarification of what is meant by "Damages" can be found in the indemnification provisions of § 12.1: "seller shall have the right within ten days after receipt of such notice to assume the control of the defense, compromise or settlement of any such action, suit proceeding, claim, liability, demand or assessment..." (JA 203.) The Agreement's use of "Damages" is broad enough to encom-

pass the potential liability of Minco's clearly asserted claim against TECO. The fact that § 12.1 allows CE the opportunity to take over the defense of any and all claims of which it has been notified clearly contemplates that upon notification, claims would still be ongoing, subject to compromise, and not already reduced to judgment. Nor is the fact that the notice was sent prior to closing itself indicative of the failure to provide notice.[9]

CE largely abandons these defenses raised before the Second Circuit, *Combustion Eng'g II*, 37 Fed Appx. at 575, on remand. (CE Mem. at 14–16.) Rather, CE counters that the notice was insufficient due to its lack of specificity in that it failed to clearly indicate that Imetal intended to seek indemnification from CE and under which provision such relief would be sought.

The 1990 Letter does provide adequate indication that it refers specifically to Minco's claims for patent infringement against TECO, as opposed to the ongoing *Minco v. CE* litigation. The 1990 Letter does not, as CE suggests, refer only to the *Minco v. CE* litigation, but rather, specifically forwards a letter from Minco referring to Minco's intention to file a claim against TECO for its use of "CEM furnaces of the type video-taped during federal court dis-

covery at the TECO plant in Greeneville." (JA 1236.) Therefore, the 1990 Letter did adequately notify CE as to the claim that would be filed against TECO.

While the 1990 Letter does not demand indemnification in so many words, it is clear that the purpose of the letter was to notify CE about the claim for indemnification purposes: "I am delivering this letter on Imetal's behalf pursuant to section 12.1 of the Agreement." (JA 1235.) The Court agrees with Imetal that there could not have been any purpose for the letter or reference, other than notice of indemnification under some provision of § 12.1. CE's contention that § 12.1 itself contains no representations or warranties, and therefore that a reasonable juror could not conclude that the reference in the 1990 Letter related to an indemnification demand under § 12.1(b) for breach of warranty, is unpersuasive. (CE Mem. at 15.) While Imetal might have been unsure under which provision CE's responsibility for indemnification might lie,[10] § 12.1 is entitled "Indemnification of Buyer and Its Affiliates" and therefore it is clear that Imetal was referencing the suit to CE for indemnification purposes.

CE's contention that the 1990 Letter did not provide CE with anything to defend because a claim had not yet been filed at

9. On remand, this Court will not consider CE's argument that any breach of warranty has been waived since it was not preserved in the Agreement before closing, because the Second Circuit has directed this Court to make a finding with regard to notice. If Imetal had waived its rights to the breach of warranty, the issue of notice would be irrelevant. *See* CE Mem. at 15.

10. It is possible that Imetal thought that it was entitled to indemnification pursuant to § 12.1(c) of the Agreement and not § 12.1(b). The record, as well as the parties submissions, demonstrate confusion as to what is included in the undefined Minco patent infringement litigation referenced in § 12.1(b).

In fact, in its earlier decision, this Court has essentially held that "Minco patent litigation" referred to *Minco v. TECO*, as well as *Minco v. CE. See Combustion Eng'g I*, 158 F.Supp.2d at 333. However, regardless of CE's extensive argument on this point, CE Mem. at 12–14, the question before this Court is specifically whether the 1990 Letter constituted notice under § 12.3(b) regardless of which indemnification provision under § 12.1 applies. The fact that if § 12.1(c) were to apply, then the $8 million limit would make the issue moot, does not relieve this Court of its obligation to consider the notice issue as directed by the Second Circuit.

that time is inaccurate, and in any event, does not render the notice inadequate. Before the claim against TECO was actually filed, it is clear that liability became almost a certainty as liability in the *Minco v. CE* case became more apparent. The contention that CE could not "step in" upon being given notice of Minco's intentions is merely conclusory. It is clear that while the *Minco v. TECO* case had not yet been filed in 1990, during settlement negotiations and while defending the *Minco v. CE* case, CE could have taken steps to protect itself from future liability with regard to TECO through discussions with Minco and/or Imetal, if by the sheer similarity of the two cases, it was not already doing so. While defending and negotiating Minco's claim against TECO referenced in the 1990 Letter may not have seemed pressing to CE, given that CE was aware that such a suit would be filed, it defies common sense to assert that there were no steps to be taken to mitigate, defend, or compromise TECO's potential liability.

In any event, the fact that Imetal's notice might have been early does not disqualify it for purposes of tolling the warranty in the Agreement. CE's reliance on *Atlantic*, 784 F.2d at 113, is misplaced. *Atlantic* emphasizes the importance of notice in providing sufficient opportunity to allow for a proper defense; this opportunity is certainly not defeated by giving early warning. In fact, in *Atlantic*, the Second Circuit found notice insufficient because the party was given only 24 hours notice of settlement. *Id.*

The ruling in *Rutgerswerke AG v. Abex Corp.*, 2002 WL 1203836 (S.D.N.Y. June 4, 2002), cited by CE, is inapposite for two reasons. First, the share purchase agreement in *Rutgerswerke* specifically indicated that the notice must be not only be timely but satisfy a specificity requirement. *Id.* at *5. Here, the notice requirement does not have any parameters as to form.

Second, the notice in this case is more specific and substantive than in *Rutgerswerke*. In fact, the deficiencies specified by the court in *Rutgerswerke* are evident in the 1990 Letter. While in *Rutgerswerke* the plaintiffs only expressed the possibility of an infraction, they did not point to a basis for their belief in the infraction, which law the alleged infraction violated or a specific entity that had threatened to take action. *Id.* at *7. In this case, all these elements were present in the notice: it is clear which patent Imetal would be infringing, what the basis for the infringement was and that Minco would assert a claim. Far from having "no reason to conclude" that upon purchase of the assets in the Agreement the buyer inherited some illegality, CE and Imetal were deploying substantial resources trying to fend off such charges in the *Minco v. CE* case.

Furthermore, the court in *Rutgerswerke* based its opinion on the actions of the plaintiffs after making their indemnity demand. *Id.* at *8. In particular, the court found that the alleged indemnitee ignored the alleged indemnitor's requests for additional information and failed to react appropriately to the supposed liability, as well as findings by the court of improper conduct by the alleged indemnitees. *Id.* at *8, *9.

■ In addition, though not precisely addressing the unique circumstances presented by this case, it is well settled New York law that upon receiving notice of a claim or proceeding brought against an indemnitee, an indemnitor who fails to assume responsibility for that claim and declines to defend the action is conclusively bound by any reasonable good faith settlement the indemnitee may make or any litigated judgment that may be rendered

against him. *ELRAC, Inc. v. Cruz,* 182 Misc.2d 523, 699 N.Y.S.2d 647, 649 (N.Y.Civ.Ct.1999) (citing *Shihab v. Bank of N.Y.,* 211 A.D.2d 430, 620 N.Y.S.2d 379 (App. Div. 1st Dep't 1995); *Baker v. Northeastern Indus. Park,* 73 A.D.2d 753, 423 N.Y.S.2d 308 (App. Div. 3rd Dep't 1979); *Feuer v. Menkes Feuer,* 8 A.D.2d 294, 187 N.Y.S.2d 116 (1st Dep't 1959)). By analogy, here, by means of the 1990 Letter, Imetal put CE on notice of the potential claim that, if and when it materialized, would qualify for indemnification under the Agreement. Therefore, upon giving notice of the action and protecting whatever rights to indemnification it was entitled to assert, Imetal acted entirely within its rights to take control of the defense of the claim and defer its claim for indemnification. Such actions by Imetal could not possibly defeat the placeholder notice provided in the 1990 Letter.

The crux of CE's defense to Imetal's assertion that it provided notice to toll the expiration of the warranty provisions in § 6 is that it was not aware that Imetal was intending to sue under § 12.1(b) for breach of the § 6.14 warranty. While the Court acknowledges that CE might have assumed that the indemnification referred to in the 1990 Letter concerned § 12.1(c), such notice would no less constitute notice to CE for purposes of tolling the warranties in § 6 pursuant to § 12.3(b). In any event, the relevant notice provision is focused on the "Damages" and the legal basis for the potential liability that would pertain, not the specific clause in the Agreement under which indemnification lies. *See Rutgerswerke,* 2002 WL 1203836, at *7 (Because of Plaintiffs' lack of compliance with the notice of claim requirements ... namely, the failure to identify *specific liability under the law* on account of the landfills ... they cannot pursue a claim for indemnification...") (emphasis added). It is the lack of specificity as to liability, not

the indemnity provision, which was deemed insufficient by the *Rutgerswerke* court. In fact, had it been made crystal clear to CE under which provision the claim for the indemnification was asserted, CE would likely have denied liability, and the same course of events would have transpired. Therefore, the Court is not convinced that, under the circumstances, pointing to the specific breach is a necessary component for notice to be sufficient.

While this Court acknowledges CE's argument that warranty expiration clauses are designed to provide a limit to a seller's continuing liability on assets already sold, that limit does not apply to claims that were ongoing and about which the seller was clearly notified within the year before the warranty expires. The Minco patent infringement litigation was a central issue in the Agreement. Therefore, under the circumstances of this case, if the Second Circuit determines that schedules 6.8 and 6.14 do not adequately exclude the *Minco v. TECO* patent litigation from the warranties in § 6, a basis would exist for a finding that CE was sufficiently aware of Minco's intention to continue its patent infringement suit against TECO and Imetal's inability to use the furnaces at issue was a substantial enough frustration to the Agreement, so as to not provide any unexpected "gutting" of contractual understandings or expirations. (CE Mem. at 16)

CE does not contest that the 1990 Letter was sent and received, nor does it contest the applicability of the provisions of the Agreement which pertain to such notice. Therefore, this Court finds that as a matter of law and uncontested fact no reasonable juror could find that the 1990 Letter did not provide notice of a claim that was given within twelve months of closing, tolling the expiration of the warranties in § 6.14 of the Agreement.

## ORDER

For the reasons stated above, it is hereby

**ORDERED** that the Court's Decision and Order dated August 15, 2001 is reaffirmed insofar as it determined that plaintiff Combustion Engineering, Inc. had not breached any duty under the parties' underlying Agreement to negotiate in good faith on behalf of defendant Imetal in the negotiations of the *Minco v. CE* litigation; and it is further

**ORDERED** that the Court's August 15, 2001 Order is reaffirmed insofar as it found that pertinent provisions of the parties' Agreement excepted the Minco patent litigation from the representations and warranties set forth in § 6.14 of the Agreement, unless the Court of Appeals for the Second Circuit in any further consideration of this matter determines that this Court's ruling on this issue is reversed, and its is further

**ORDERED** that in the event the Court's judgment is reversed with respect to the foregoing issues, Imetal would be entitled to a tolling of the expiration of the warranty provided in the Agreement and to a corresponding adjustment in the judgment this Court rendered in favor of plaintiff in the August 15, 2001 Order.

The Clerk of Court is directed to close this case, subject to reopening as necessary for the purposes of any further proceedings in accordance with the Court of Appeals' mandate.

**SO ORDERED.**

## DECISION AND AMENDED ORDER

By Decision and Order dated November 20, 2002 (the "November 2002 Decision"), the Court reaffirmed its original Decision and Order dated August 15, 2001 (the "Original Decision"), in which the Court granted summary judgment to Combustion Engineering, Inc. and Asea Brown Boveri, Inc. (together, "CE").[1] Among its other holdings [2], the Court reaffirmed its Original Decision to award summary judgment in favor of CE based on its determination that the pertinent provisions of the parties' stock purchase agreement entered into in May 1990 between CE and Imetal (the "Agreement") excepted the Minco patent litigation from the representations and warranties in § 6.14 of the Agreement. Without reversing this separate and independent ground for granting summary judgment to CE on Imetal's counterclaims, the Second Circuit vacated the Original Decision dismissing Imetal's counterclaim and directed the Court to determine in the first instance whether the June 6, 1990 letter (the "June 1990 Letter") constituted notice and remanded for consideration of this issue. *See Combustion Eng'g*, 37 Fed.Appx. at 574–575. In its November 2002 Decision, the Court determined that the June 1990 Letter did

---

1. A detailed factual and procedural summary of this case can be found in both the Original Decision and the November 2002 Decision. The Original Decision is reported as *Combustion Eng'g v. Imetal*, 158 F.Supp.2d 327 (S.D.N.Y.2001) (*"Imetal I "*). The November 2002 Decision is reported as *Combustion Eng'g, Inc. v. Imetal*, No. 97 Civ. 3146, 2002 WL 31641467 (S.D.N.Y. Nov. 20, 2002) (*"Imetal II "*).

2. The Second Circuit had vacated the Court's Original Decision concerning CE's obligation to settle the Minco patent litigation in good faith. *See Combustion Eng'g v. Imetal*, 37 Fed.Appx. 573, 574. (2d Cir.2002). In the Original Decision, as reaffirmed in the November 2002 Decision, this Court held that CE did not have a duty to act in good faith on behalf of Imetal in its negotiations of the litigation brought by Minco, Inc. ("Minco") against CE for patent infringement. This matter, however, is not at issue in CE's motion for reconsideration at issue here.

constitute notice. The Court also ordered that in the event its separate and individual ground articulated in the Original Decision for dismissing Imetal's counterclaim were to be reversed by the Second Circuit[3], a corresponding adjustment in the original judgment would be made. CE now moves for entry of judgment and for reconsideration pursuant to the Federal Rules of Civil Procedure ("Fed. R. Civ.P.") 58(d) and 60, and Local Civil Rule 6.3. For the reasons set forth below, the motion is GRANTED in its entirety.

Under Local Rule 6.3, which governs motions for reconsideration, the moving party must demonstrate controlling law or factual matters put before the court on the underlying motion that the movant believes the court overlooked and that might reasonably be expected to alter the court's decision. *See SEC v. Ashbury Capital Partners, L.P.*, No. 00 Civ. 7898, 2001 WL 604044, (S.D.N.Y. May 31, 2001) (citing *AT & T Corp. v. Comty. Network Servs., Inc.*, No. 00 Civ. 316, 2000 WL 1174992, at *1 (S.D.N.Y. Aug.18, 2000) and Local Rule 6.3). Reconsideration of a court's previous order is an "extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *In re Health Management Sys. Inc. Sec. Litig.*, 113 F.Supp.2d 613, 614 (S.D.N.Y.2000).

CE requests three modifications to the Order contained in the November 2002 Decision (the "November 2002 Order"): (i) entry of judgment, (ii) modification of the second paragraph of the Order to read "the Minco patent litigation (including the *Minco v. TECO* suit)", which is a matter of clarification only since it is consistent with the substance of the November 2002 Decision, and (iii) modification of the third paragraph of the Order respecting the consequences of a Second Circuit reversal, which would remove the suggestion that a reversal would necessarily entitle Imetal to a downward adjustment in the judgment for CE. Imetal does not oppose CE's first two requests but contests the third.

Although the Court already entered judgment in its Original Decision, as well as in its September 28, 2001 amended judgment, (JA 1622–1624), the Second Circuit indicated in its decision that jurisdiction would automatically be restored to it "upon notice by any party to the Clerk that the District Court had entered its judgment on the issues presented on remand." *Combustion Eng'g*, 37 Fed.Appx. at 575. CE correctly points out, and Imetal concedes, that entry of judgment is thereby directed on remand. *Id.; see also United States v. Uccio*, 940 F.2d 753, 758 (2d Cir.1991). Since the November 2002 Decision did not reenter judgment in favor of CE, the Court will amend its order to enter judgment.

Next, CE suggests that the Court amend its Order to clarify that in the Original Decision, and as reaffirmed by the November 2002 Decision, the Court understands the phrase "Minco patent litigation" in the Agreement to refer to both the litigation brought Minco, Inc. against CE that was pending before CE at the time of the Agreement ("*Minco v. CE*") and the continuation of that litigation against Imetal, which was filed in 1995 ("*Minco v. TECO*"). While CE agrees that this holding of the Court was made clear in the November 2002 Decision, the Court will modify the language of the third paragraph of the Court's Order as CE suggests, for purposes of clarification.

---

**3.** The contingency of such reversal is the only reason this Court could foresee as relevant the issue of whether Imetal's June 1990 Letter constituted notice tolling the representations and warranties in the Agreement.

Finally, CE argues that the second paragraph of the Court's Order goes too far in deducing that, in the event the separate and individual ground for dismissing Imetal's counterclaim in the Original Decision is reversed by the Second Circuit, based on its determination that the June 1990 Letter did constitute notice, a corresponding adjustment in the judgment ordered by the Court would necessarily be warranted. CE offers three reasons in urging that regardless of the Court's holding on the notice provided by the June 1990 Letter, Imetal would not be entitled automatically to a corresponding adjustment of the award in the event the Court's independent ground for dismissing Imetal's counterclaim is overturned: (i) Imetal waived its breach of warranty claim by closing the transaction in full knowledge of the breach; (ii) the cost of Imetal's settlement with Minco arose "in connection with" or "by reason of" the Minco patent litigation, and thus are subject to § 12.1(c) of the Agreement's liability cap; and (iii) Imetal has not established that it was damaged by its acquisition of an interest in Minco to settle the *Minco v. TECO* suit.

The confusion on this point is aggravated by the difficult position in which the Court finds itself in theoretically reversing itself in order for the Second Circuit's direction to make a finding on the issue of whether the June 1990 Letter constituted notice tolling the warranties in the Agreement, pursuant to § 12.3(b), to be relevant. Accordingly, in its November 2002 Decision, the Court made a finding on the issue of notice regardless of the fact that based on the current posture of this case, such a finding is unnecessary. Furthermore, in order to consider the issue of notice in the context of notice being relevant, the Court explicitly assumed in its November 2002 Decision that all other defenses that would make notice moot were not relevant for the purposes of determining the issue of notice. *See Imetal II,* 2002 WL 31641467, at \*8 n. 10, \*7 n. 9. In the interest of judicial economy, the Court did not go so far as to make findings of fact or conclusions of law, based on a trial on the merits or on summary judgment, on issues only theoretically and tangentially pertinent at this point in the proceedings, other than where specifically directed by the Second Circuit, given the Court's dispositive holding on an alternate ground.

For example, as to CE's waiver argument, in its November 2002 Decision, the Court noted that it would

> not consider CE's argument that any breach of warranty has been waived since it was not preserved in the Agreement before closing, because the Second Circuit has directed this Court to make a finding with regard to notice. If Imetal had waived its rights to the breach of warranty, the issue of notice would be irrelevant.

*Id.* at \*7 n. 9. In other words, the Court declined to consider the issue of waiver, which was not briefed by the parties on remand, but is an alternate ground that would dispose of Imetal's counterclaim for breach of representations and warranties in the Agreement, because if such a finding were made, any such warranties would be entirely foreclosed and the inquiry into notice would not be relevant. However, the Court did not intend to make a finding as to this contingent possibility; the Court only deemed it necessary to assume that the waiver argument would necessarily fail if the Second Circuit deemed the issue of notice relevant. Similarly, the existence of damages and the pertinence of the liability cap in § 12.1(c) of the Agreement are issues that are relevant only if the Second Circuit reverses the Court's independent ground for dismissing Imetal's counterclaim and were therefore not addressed at this point in the proceedings.

These three arguments had been presented by CE to the Second Circuit on appeal, urging the Circuit Court to refrain from disturbing the summary judgment decision. However, the Second Circuit nonetheless vacated this Court's judgment as to Imetal's counterclaim and the remanded the case for further proceedings on the narrow question of whether the June 1990 Letter constituted notice to CE. Had the Circuit Court found any of these three arguments persuasive it need not have remanded the case.

However, as the Second Circuit expressly indicated that it "intimate[s] no view on the merits of the legal or factual questions to be considered or any substantive aspects of the earlier proceedings before the District Court," but rather remanded this case prior to making substantive findings on the merits, this Court should refrain from presuming that those assumptions that make the inquiry into notice relevant have necessarily already been decided on the merits by the Second Circuit. *See Uccio*, 940 F.2d at 758. Therefore, the Court will amend the November 2002 Decision in order to clarify that it did not intend to decide issues it only assumes to have been deemed irrelevant by the Second Circuit for purposes of preventing an inquiry into the issue of notice from being moot.

Furthermore, the Court's November 2002 Order only indicates that "Imetal would be entitled to a tolling of the expiration of the warranty provided in the Agreement and to a corresponding adjustment in the judgment..." The Court did not intend to determine on summary judgment the extent of the potential corresponding adjustment that would pertain if the contingency came to pass. Rather, the Court only intended that in the event the tolling of the expiration of the warranty was deemed pertinent by the Second Circuit, and damages were found to exist based on the tolling of that notice, then a corresponding adjustment would ensue. Of course, if it was later determined that no damage resulted from the counterclaim, then no adjustment would be necessary. Similarly, if the liability cap was held to apply to the *Minco v. TECO* lawsuit or Imetal was deemed to have waived the pertinent representations and warranties, then the corresponding adjustment would be irrelevant.

However, to erase any possibility that the Court's November 2002 Order could be understood as having already decided these three issues as a matter of fact or law, the Court will modify the second paragraph of the November 2002 Order as suggested by CE to clarify its restraint on these issues. This amendment is made pending a Second Circuit ruling on the Court's independent ground for dismissing Imetal's counterclaim or, in the alternative, pending direction from the Second Circuit for this Court to make such findings of fact and law, despite the alternate holding that would make such a finding moot, as the Second Circuit did concerning the issue of whether the June 1990 Letter constituted notice under the Agreement.

Essentially, the Court grants CE's motion for reconsideration because of the understandable confusion that, under the unique posture of the case, has ensued as to the scope of this Court's November 2002 Decision. While the Court does not believe that entirely new issues of law or fact are presented by CE, as the standard for granting a motion for reconsideration normally warrants, the Court will exercise its discretion under Fed.R.Civ.P. 60 to modify the November 2002 Order as CE requests to eliminate the unforeseen confusion described herein.

## ORDER

For the reasons stated above, it is hereby

**ORDERED** that the Order in Part III of the Court's November 2002 Decision is amended to read as follows:

For the reasons stated above, it is hereby

**ORDERED** that the Court's Decision and Order dated August 15, 2001 is reaffirmed insofar as it determined that plaintiff Combustion Engineering, Inc. had not breached any duty under the parties' underlying Agreement to negotiate in good faith on behalf of defendant Imetal in the negotiations of the *Minco v. CE* litigation; and it is further

**ORDERED** that the Court's August 15, 2001 Order is reaffirmed insofar as it found that pertinent provisions of the parties' Agreement excepted the Minco patent litigation (including the *Minco v. TECO* suit) from the representations and warranties set forth in § 6.14 of the Agreement, unless the Court of Appeals for the Second Circuit in any further consideration of this matter determines that this Court's ruling on this issue is reversed, and its is further

**ORDERED** that in the event the Court's judgment is reversed with respect to the foregoing issue, Imetal would be entitled to a tolling of the expiration of the warranty provided in the Agreement; and it is further

**ORDERED** that the Clerk of Court enter judgment in favor of Combustion Engineering, Inc. and Asea Brown Boveri, Inc. and against Imetal for $35,232,139; plus post-judgment reasonable attorneys fees, costs and expenses to be determined at a later date; plus post-judgment interest on the total amount of the judgment at the annual rate of 3.44% pursuant to 28 U.S.C. 1961.

The Clerk of Court is directed to close this case, subject to reopening as necessary for the purposes of any further proceedings in accordance with the Court of Appeals' mandate.

**SO ORDERED.**